## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**DR. JEFFREY M. GOLD, M.D.,**

   Plaintiff,

vs.

**MICHIGAN KIDNEY CONSULTANTS, P.C.,**
*a domestic professional corporation,* **FAHD AL-SAGHIR, M.D.,**
*an individual,* **FAWAZ AL-EJEL, M.D.**, *an individual,*
**GHADEER HANNOUDI, M.D.,** *an individual,*
**KALYANA RAMAMURTHI, M.D.,** *an individual,*
**SUNDEEP DHILLON, M.D.,** *an individual,*
**STEVE RANKIN, M.D.,** *an individual,*
and **PITI RATANAPANICHKICH, M.D.**, *an individual,*
*jointly and severally,*

   Defendants.

Case No: 22-cv-10699
Hon.  Matthew F. Leitman
Mag. Elizabeth A. Stafford

---

| **DEBORAH GORDON LAW** | **WOLFSON BOLTON PLLC** |
|---|---|
| Deborah L. Gordon (P27058) | Anthony J. Kochis (P72020) |
| Elizabeth Marzotto Taylor (P82061) | Attorney for Defendants |
| Sarah Gordon Thomas (P83935) | 3150 Livernois, Suite 275 |
| Molly Savage (P84472) | Troy, Michigan 48083 |
| Attorneys for Plaintiff | (248) 247-7105 |
| 33 Bloomfield Hills Parkway, Suite 220 | akochis@wolfsonbolton.com |
| Bloomfield Hills, Michigan 48304 | |
| (248) 258-2500 | **BENESCH LAW** |
| dgordon@deborahgordonlaw.com | Margo Wolf O'Donnell (Ohio #6225758) |
| emarzottotaylor@deborahgordonlaw.com | Jordan Call (Ohio #0096040) |
| sthomas@deborahgordonlaw.com | Attorneys for Defendants |
| msavage@deborahgordonlaw.com | 71 S. Wacker Drive, Suite 1600 |
| | Chicago, Illinois 60606 |
| | (312) 212-4982 |
| | (216) 363-6169 |
| | modonnell@beneschlaw.com |
| | jcall@beneschlaw.com |

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
## PLAINTIFF'S FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

INDEX OF AUTHORITIES................................................................................................ii

I.  RELEVANT FACTS.......................................................................................... 1

II.  LAW AND ARGUMENT ................................................................................. 6

A.  Rule 12(b)(6) Standard of Review ........................................................ 6

B.  Plaintiff Sufficiently Pled All Elements Required under the FCA, Including that he Engaged in Protected Activity under the FCA................................ 6

1.  Plaintiff Pled that he Engaged in "Protected Activity"...................7

2.  Plaintiff's Complaints Put Defendants on Notice that he was Concerned about Fraud on the Government...................................12

C.  Plaintiff Pled a Causal Nexus Between his Protected Activity and his Termination .................................................................................. 14

D.  The Individual Doctors are Properly Named as Defendants to Plaintiff's FCA Retaliation and Michigan Medicaid False Claims Act ("MMFCA")  ...........18

E.  Plaintiff Amply Pled Protected Activity and Causation under the Retaliation Provisions of the ELCRA and 42 U.S.C. § 1981 .......................................... 20

F.  Plaintiff Sufficiently Pled that he Engaged in Protected Activity under the MMFCA................................................................................................22

G.  Plaintiff's Public Policy Tort Claims were Properly Pled .............................24

H.  Plaintiff Sufficiently Pled that he Made Reports of Malpractice in Count III and Named the Individual Defendants..................................................25

I.  Plaintiff Properly Named the Individual Defendants in his Breach of Contract Claim.................................................................................26

# INDEX OF AUTHORITIES

## Cases

*Alcona Cnty. v. Wolverine Env't Prod., Inc.*,
   233 Mich. App. 2381998) .................................................................................. 22

*All. Assocs., L.C. v. All. Shippers, Inc.*,
   2006 WL 1506687 (Mich. Ct. App. June 1, 2006) ....................................... 27

*Apseloff v. Family Dollar Stores, Inc.*,
   236 Fed. App'x 185 (6th Cir. 2007) ................................................................ 6

*Att'y Gen. v. Ankersen*,
   148 Mich. App. 524 (1986) ............................................................................. 26

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................... 6

*Benison v. Ross*,
   765 F.3d 649 (6th Cir. 2014) ........................................................................... 22

*Bonewitz v. NewQuest, LLC*,
   2015 WL 1825375 (M.D. Tenn. Apr. 22, 2015) ........................................... 13

*Clifford v. Cactus Drilling Corp.*,
   419 Mich. 356 (1984) ....................................................................................... 24

*Columbia Natural Res., Inc. v. Tatum*,
   58 F.3d 1101 (6th Cir. 1995) ............................................................................ 6

*Dep't of Agric. v. Appletree Mktg., L.L.C.*,
   485 Mich. 1 (2010) ........................................................................................... 26

*Dye v. Office of the Racing Comm'n*,
   702 F.3d 286 (6th Cir.2012) ........................................................................... 16

*El-khalil v. Tedeschi*,
   2019 WL 2325610 (E.D. Mich. May 31, 2019) ........................................... 18

*Fakorede v. Mid-S. Heart Ctr., P.C.*,
   709 F. App'x 787 (6th Cir. 2017) ................................................................ 8, 9

*Georgandellis v. Holzer Clinic, Inc.*,
  2009 WL 1585772 (S.D. Ohio June 5, 2009) ........................................... 12, 16

*Halasa v. ITT Educ. Svs., Inc.*,
  690 F.3d 844 (7th Cir. 2012) ................................................................... 8

*HDC, LLC v. City of Ann Arbor*,
  675 F.3d 608 (6th Cir. 2012) ................................................................... 25

*Hishon v. King & Spalding*,
  467 U.S. 69 (1984) .................................................................................... 6

*Ickes v. Nexcare Health Sys., L.L.C.*,
  178 F. Supp. 3d 578 (E.D. Mich. 2016) .............................................. 12, 14

*Jones–McNamara v. Holzer Health Sys.*,
  630 Fed.Appx. 394 (6th Cir.2015) ......................................................... 6

*Kachaylo v. Brookfield Tp. Bd. of Trs.*,
  778 F.Supp.2d 814 (N.D. Ohio 2011) .................................................... 7

*Lee v. Sheet Metal Workers' Nat. Pension Fund*,
  697 F. Supp. 2d 781 (E.D. Mich. 2010) ................................................ 6

*McKenzie v. BellSouth Telecommunications, Inc.*,
  219 F.3d 508 (6th Cir. 2000) ......................................................... 7, 8, 11

*Mickey v. Zeidler Tool & Die Co.*,
  516 F.3d 516 (6th Cir.2008) .................................................................. 16

*Mikes v. Strauss*,
  889 F.Supp. 746 (S.D.N.Y.1995) ......................................................... 11

*Mikhaeil v. Walgreens Inc.*,
  2015 WL 778179 (E.D. Mich. 2015) ....................................... 7, 8, 11, 14, 16

*Mruz v. Caring, Inc.*,
  991 F. Supp. 701 (D.N.J. 1998) ............................................................ 18

*Nguyen v. City of Cleveland*,
  229 F.3d 559 (6th Cir. 2000) ........................................................... 19, 22

iii

*Palladino ex rel. U.S. v. VNA of S. New Jersey, Inc.*,
    68 F. Supp. 2d 455 (D.N.J. 1999) ................................................................... 19

*Pencheng Si v. Laogai Rsch. Found.*,
    71 F. Supp. 3d 73 (D.D.C. 2014) ..................................................................... 15

*Pitts v. Howard Univ.*,
    13 F.Supp.3d 14, 16–17, 19–21, 2014 WL 69032 (D.D.C.2014) ..................... 17

*Scott v. Metro. Health Corp.*,
    234 Fed.Appx. 341 (6th Cir.2007) ................................................................... 14

*Suchodolski v. Michigan Consol. Gas Co.*,
    412 Mich. 692 (1982) ....................................................................................... 24

*Tibor v. Michigan Orthopaedic Inst.*,
    72 F. Supp. 3d 750 (E.D. Mich. 2014) ............................................................ 10

*U.S. ex rel. Kent v. Aiello*,
    836 F. Supp. 720 (E.D. Cal. 1993) ................................................................... 19

*U.S. ex rel. Lockyer v. Hawaii Pac. Health*,
    490 F. Supp. 2d 1062 (D. Haw. 2007) ............................................................. 13

*U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*,
    525 F.3d 439 (6th Cir. 2008) ................................................................... 7, 8, 10

*U.S. ex rel. McKenzie v. BellSouth Telecommunications, Inc.*,
    123 F.3d 935 (6th Cir. 1997) ........................................................... 7, 8, 11, 12

*United States ex rel. Rahimi v. Rite Aid Corp.*,
    3 F.4th 813 (6th Cir. 2021) .............................................................................. 11

*U.S. ex rel. Yanity v. J & B Med. Supply Co.*,
    2012 WL 4811288 (E.D. Mich. Oct. 10, 2012) ............................................... 23

*U.S. ex rel. Yesudian v. Howard Univ.*,
    153 F.3d 731 (D.C. Cir. 1998) ........................................................................... 8

*Vander Boegh v. EnergySolutions, Inc.*,
    536 F. App'x 522 (6th Cir. 2013) ...................................................................... 7

*Williams v. Michigan Dep't of Health & Hum. Servs.*,
   2020 WL 4050246 (E.D. Mich. July 20, 2020) ................................................. 21

**Other Authorities**

31 U.S.C.A. § 3730(h) ......................................................................... 18
MCL § 400.610c ................................................................................. 23
MCL 400.610(c)(1) ............................................................................. 22
Mich. Comp. Laws Ann. § 400.610c (West) ....................................... 22

**Rules**

Fed. R. Civ. P. 8(a)(2) ....................................................................... 25
Federal Rule of Procedure 12(b)(6) ..................................................... 6

## I.     RELEVANT FACTS

Plaintiff Dr. Jeffrey Gold is one of Michigan's pre-eminent nephrologists. ECF No. 23, PageID.143-144. He worked as nephrologist for MKC between August 2006 and November 2021. *Id.* During this time, MKC owned and operated 13 office locations and 28 in-center hemodialysis facilities in the Detroit-metropolitan area. *Id.* at PageID.141. Defendants devised a "productivity model" incentivizing MKC physicians to have as many patients as possible, and prioritize in-center hemodialysis treatment, all of which is billed to the government. *Id.* at PageID.145-146. This is despite the fact that in-center hemodialysis has been shown to increase morbidity rates, exacerbate comorbidities, and negatively affect quality of life. *Id.* at PageID.147.

Over time, MKC physicians began accumulating inordinately high numbers of patients, and placing them in in-center hemodialysis treatment, including when such placement was medically unnecessary, improper, or incompetent. These treatments were billed to the government. *Id.* at PageID.148. Plaintiff investigated these practices and reported to Defendants that MKC physicians were billing the government for improper, incompetent, and unnecessary medical procedures. *Id.* He reported that profit-driven preference for government-funded in-center hemodialysis treatment resulted in fraudulent government billings. *Id.* at PageID.148-149. Dr. Gold also confronted MKC and the individual Defendants with his findings that MKC physicians, including Board members, were discriminating against patients by targeting non-white

patients as the source of their fraudulent billings for in-center hemodialysis. *Id.* at PageID.149.

To be specific, Plaintiff complained verbally and in writing to the individual Defendants, including at Board meetings, that on at least 20 occasions, including during 2019 and 2020, MKC physician Dr. Preetham Reddy billed the government for consultations with Dr. Gold's patients that Dr. Reddy never performed. *Id.* He also reported multiple instances of physician incompetency and unnecessary and/or improper procedures which were fraudulently billed to the government. *Id.* Throughout 2018, 2019, 2020, and up to the date of his termination in November of 2021, Dr. Gold reported verbally and in writing to Defendants that MKC fraudulently billed the government for physician consultations required by CMS that were not completed. *Id.* at PageID.151. Instead of conducting mandatory monthly consultations with each in-center hemodialysis patient, MKC physicians billed the government for walking through the dialysis center and "waving" to their 100+ patients. *Id.*

In August 2019, Plaintiff complained to Defendants that MKC doctors, including Defendants, were carrying patient loads so large that patients could not be properly cared for (a practice shown to increase mortality rates) in order to increase their government billings. *Id.* at PageID.150-151. In multiple emails sent in early August 2021 and late October 2021, Dr. Gold reported to the Defendant Board members that doctors were performing fast, high-volume, poor quality, medically unnecessary, incompetent, or improper in-center hemodialysis in order to fraudulently increase

2

government billings. He also made these complaints at Board meetings held in/around August and October 2021. *Id.* at PageID.152.

Less than a week before his termination, Dr. Gold credibly accused MKC physician and Defendant Board member Dr. Fawaz Al-Ejel, of medical malpractice and fraudulent billing. Plaintiff complained via email to Defendant Board members that Defendant Dr. Al-Ejel billed for negligent and incompetent medical care that resulted in a patient progressing to End Stage Renal Disease. *Id.* at PageID.152. Plaintiff complained that Dr. Al-Ejel's decision to forego the appropriate standard of care and push the patient into government-funded in-center hemodialysis was motivated by his desire to fraudulently bill the government. *Id.* at PageID.153.

Less than a week before being fired, on October 29, 2021, Plaintiff emailed 19 MKC physicians and the Defendant Board Members, stating:

> "$$$$$$$$$$? Wow I understand if I am fired then it removes the question of quality of care and allows the model to keep pushing fast quick care exacerbated by the geography of dialysis patients-to Pontiac and providence and the money they generate. Fawaz who is [patient] H? 4 gloms at 69 and no transplant referral and the biopsy was inadequate… As Fahd always says we make more than any other group in the nation we should be grateful for the money we make…" ECF No. 23, PageID.153, ¶ 66.

On October 30, 2021, Dr. Gold again complained that:
> "Quality doesn't matter but how many we see and how quickly maximizes our bottom line and [government] reimbursement…When was the last time you looked at a biopsy with a pathologist? When was the last time you didn't start dialysis based on a BUN and creatinine through a catheter…Quality Fawaz NOT quantity is vital sorry you are dictated by Fahd's carrot and money." ECF No. 23, PageID.153, ¶ 66.

It is uncontested that the "$$$$$$$$$", "money", and "reimbursement" Plaintiff referred to was from government billings. Defendant Fawaz Al-Eiel responded angrily but did not deny the allegations. Defendant Fahd Al-Saghir told Plaintiff to "Please stop sending these negative emails as we have formally asked you to do so we can live our lives in peace." *Id.*

In an August 2019 Board meeting, Plaintiff confronted Defendant Dr. Al-Ejel when Al-Ejel admitted intentionally denying African American patients education on preventative care and alternatives to in-center hemodialysis because of their race. *Id.* at PageID.154-155. Al-Ejel funneled these patients into lucrative in-center hemodialysis, which he billed to the government. *Id.* Dr. Gold told Defendants that this was "discrimination" and that it appeared Defendant Dr. Al-Ejel pushed these 174 patients into in-center hemodialysis treatment to profit from government billings regardless of whether the care was necessary, safe, or appropriate. *Id.* at PageID.155.

In July 2021, Plaintiff complained to the Board that a staff member was denied a promotion due to her race. *Id.* In August 2021, Plaintiff told Defendants that according to data he had reviewed, race discrimination had continued, reflected in MKC's "serious geographical bias" towards in-center hemodialysis in areas with high non-white populations. *Id.* at 155-156. In the same report, Dr. Gold again complained that his staff member was denied a promotion due to her race and explained that a similarly-situated white employee was deemed "irreplaceable". He stated that, "This was an error by an unequal opportunity employer." *Id.* at PageID.156.

Defendants responded to Plaintiff's complaints by telling him he was a "bad businessman", that he "did not understand the business of medicine", by characterizing him as "disruptive", and by instructing him to "stop sending negative emails". *Id.* By August 2021, Defendants could no longer countenance Plaintiff's complaints. They began an effort to terminate him. On August 8, 2021, Defendant Dr. Al-Saghir told Plaintiff that if he did not believe in MKC's business model, Defendants would work with him on an "exit strategy". Defendant Dr. Al-Saghir admitted he had already met with MKC's legal counsel to discuss Plaintiff's departure. *Id.* at PageID.156-157. Between August and October 2021, Defendants devised and put to a vote a last-minute change to the corporate vesting schedule designed to strip Plaintiff of his fully vested status before his forthcoming termination. *Id.* at PageID.157.

Defendants terminated Plaintiff's employment on November 4, 2021, days after his last complaint of malpractice, fraudulent billing and race discrimination. *Id.* At the time, Plaintiff had an excellent reputation in the medical community, no record of any policy violation or wrongdoing, no administrative complaints against him by any state agency, no malpractice lawsuits, and no patient complaints. *Id.* at PageID.157-158. Plaintiff's termination was retaliatory. Defendants fired Plaintiff solely because he credibly accused them of defrauding the government and committing malpractice and race discrimination. *Id.* at PageID.157-158. Defendants admitted this in their termination letter, stating that he was fired for impacting "cohesiveness" and bringing "disrepute to the group" through his complaints. *Id.* at PageID.157.

## II.    LAW AND ARGUMENT

### A.    Rule 12(b)(6) Standard of Review

Under Federal Rule of Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Lee v. Sheet Metal Workers' Nat. Pension Fund*, 697 F. Supp. 2d 781, 784 (E.D. Mich. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[A] judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations." *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995).  The Court may only dismiss a complaint "'if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Apseloff v. Family Dollar Stores, Inc.*, 236 Fed. App'x 185, 187 (6th Cir. 2007) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)).

### B.    Plaintiff Sufficiently Pled All Elements Required under the FCA, Including that he Engaged in Protected Activity under the FCA

A claim under § 3730(h) requires proof that (1) the plaintiff "was engaged in a protected activity"; (2) his "employer knew that [he] engaged in the protected activity"; and (3) his "employer discharged ... the employee as a result of the protected activity." *Jones–McNamara v. Holzer Health Sys.*, 630 Fed.Appx. 394, 398 (6th Cir.2015). A § 3730(h) plaintiff need not plead or establish an actual violation of § 3729. *Jones–McNamara*, 630 Fed.Appx. at 399 (citing *Graham Cnty. Soil & Water*

*Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 428 n. 1 (2005)). The protected activity must relate to "exposing fraud" or "involvement with a false claims disclosure." *McKenzie v. BellSouth Tel., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000) As to the second prong, the employer must be on notice that the plaintiff's complaints have some nexus to a concern about fraud on the federal government. *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 450 (6th Cir. 2008). The notice to the employer need not explicitly characterize the plaintiff's concerns as involving false claims against the government. *Kachaylo v. Brookfield Tp. Bd. of Trs.*, 778 F.Supp.2d 814, 820–821 (N.D. Ohio 2011). Finally, as to the third prong, "an adverse employment action in the retaliation context requires a showing that a reasonable employee would have found the challenged action materially adverse, which means it well might have dissuaded a reasonable worker from engaging in protected activity." *Vander Boegh v. EnergySolutions, Inc.*, 536 F. App'x 522, 529 (6th Cir. 2013) (cleaned up).  Plaintiff meets each of these requirements.

### 1.      Plaintiff Pled that he Engaged in "Protected Activity"

The Fraud Enforcement and Recovery Act of 2009 (FERA), PL 111-21, May 20, 2009, 123 Stat 1617, expanded the scope of protected activity under the FCA. *See Mikhaeil v. Walgreens Inc.*, 2015 WL 778179 at *7 (E.D. Mich. 2015) (explaining FERA's amendment of the FCA's anti-retaliation provision). Two categories of conduct are considered protected activity under the Act. "In addition to protecting lawful acts taken in furtherance of an action under the FCA, it also protects 'employees from being fired

for undertaking other efforts to stop violations of the Act, such as reporting suspected misconduct to internal supervisors.' " *Id.* quoting *Halasa v. ITT Educ. Svs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012). *See also* 155 Cong. Rec. E1295-03, E1300, 2009 WL 1544226 (daily ed. June 3, 2009) (statement of Rep. Berman that § 3730(h) protects steps such as internal reporting to a supervisor, whether or not they are clearly in furtherance of a potential or actual qui tam action). The FCA's legislative history, approvingly cited by the courts, states that "Protected activity should…be interpreted broadly." S.REP. NO. 99–345, at 35 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5300; *see also U.S. ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 944 (6th Cir. 1997) (same).

Contrary to Defendants' assertions, threatening to file a qui tam suit or make a report to the government, "is not the only way" to engage in protected activity. *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998). Plaintiff's numerous reports to MKC leadership were "undoubtedly an 'effort' " to stop FCA violations. *Mikhaeil*, 2015 WL 778179, at *7 (internal report to a supervisor is undoubtably an "effort"). Plaintiff satisfied this requirement by gathering and presenting evidence to Defendant Board Members that MKC physicians were engaged in fraudulent activities. *U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449–50 (6th Cir. 2008).

Defendants' reliance on *Fakorede*, is inapt. The Sixth Circuit held that Fakorede did not engage in protected activity under the FCA because he expressed concerns about whether costs attributed to him by Mid-South were correctly calculated and reimbursed by a Tennessee entity and reminded others to check for compliance with

federal law. "This failed to allege conduct reasonably related to fraud against the federal government." *Fakorede v. Mid-S. Heart Ctr., P.C.*, 709 F. App'x 787, 790 (6th Cir. 2017). Here, Plaintiff unambiguously complained about in-center hemodialysis treatments that were billed to the federal government.

Similarly, in *Mehlman* the plaintiff did not plead that he complained about unnecessary procedures to expose or prevent fraud. 2021 WL 3560571, at *6 (S.D. Ohio Aug. 11, 2021). Mehlman's allegations concerned danger to patients rather than his employer billing the government for unnecessary procedures. *Id.* In sharp contrast, the common theme of Dr. Gold's allegations was that MKC should not funnel patients into improper, unnecessary, or incompetent treatment just so they could fraudulently bill the government for that treatment and "maximize [MKC's] bottom line and *reimbursement*" from the government. ECF No. 23, PageID.147-155, ¶¶ 40, 44-48, 53-56, 62-66, 69-73 (emphasis added). Also, in the months leading up to his termination, Plaintiff complained multiple times to the Defendant Board Members that MKC physicians fraudulently billed the government for improper, unnecessary, and unsafe procedures that they foisted upon non-white patients due to their race for the purpose of maximizing government billings. *Id.* at PageID.154-156, ¶¶ 69-73, 76. Plaintiff did not complain because Defendants complied with government regulations. He complained that Defendants exploited patients and the government to illegally maximize government billings. And, contrary to Defendants' assertions, his complaints pointed to specific instances of these violations, including specific procedures or

practices that occurred on specific dates and specific patients whose care were the sources of the false claims.

In short, the Amended Complaint outlines that on multiple occasions, Plaintiff told Defendant Board members that MKC physicians were fraudulently billing the government for medical services.  The heart of Defendants business model was to seek reimbursement from the federal government for as many hemodialysis and correlated procedures and services as possible, including where the procedures were not medically necessary, where they jeopardized patient safety, and where certain services billed for were never provided (e.g. "wave through" consultations and instances where patients were never actually seen, *supra*, at 2).  The core of Plaintiff's allegations was suspected fraud. *Id.* at PageID.148, 159 ¶¶ 45-47, 93. The statutory definition of protected activity includes what Plaintiff did here—reporting suspected misconduct to internal supervisors. *Tibor v. Michigan Orthopaedic Inst.*, 72 F. Supp. 3d 750, 761 (E.D. Mich. 2014) (plaintiff told her employer that she believed a contract violated an anti-kickback statute).

In *U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449 (6th Cir. 2008), the plaintiff engaged in protected activity by writing a letter to the president and general manager asserting that she was placed on leave for refusing to participate in illegally under-reporting occupational injuries and illnesses to the government, resulting in incentive payments to the company under its government contract. *Marlar*, 525 F.3d at 449. Like in *Marlar*, Plaintiff repeatedly complained to MKC leadership that MKC

physicians were fraudulently billing the government for unnecessary, improper, incompetent, or non-existent medical procedures.

In *U.S. ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 944 (6th Cir. 1997), *abrogated on other grounds by United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813 (6th Cir. 2021) the Sixth Circuit endorsed the interpretation of protected activity advanced by the district court in *Mikes v. Strauss,* 889 F.Supp. 746 (S.D.N.Y.1995). In *Mikes*, the court concluded that the plaintiff's observations of inappropriate use of tests, investigation of the use of tests, and reports of the same were protected activity. The Sixth Circuit held that it "believe[d] the *Mikes* interpretation…to be correct." *U.S. ex rel. McKenzie*, 123 F.3d at 944. The *McKenzie* Court accordingly held that the plaintiff engaged in protected activity by complaining to her supervisors that the company, to avoid having to issue refunds, falsified trouble reports by misclassifying lines as being in service or diminished service when they were actually out of service, and falsely reporting that service was restored within 24 hours. Similarly, here, Plaintiff complained on multiple occasions that his MKC colleagues had billed the government for medical services they had not performed, or which were improper, unnecessary, or incompetent. *Id.* at 937, 944.

In *Mikhaeil v. Walgreens Inc.*, 2015 WL 778179, at *3 (E.D. Mich. Feb. 24, 2015), the plaintiff engaged in protected activity by telling her supervisor about "prescription violations" by another employee, including when the wrong medication was provided, and an incorrectly filled a prescription was not reversed. Similarly, in *Ickes v. Nexcare*

*Health Sys., L.L.C.*, 178 F. Supp. 3d 578, 595 (E.D. Mich. 2016), the plaintiff engaged in protected activity by complaining that she believed defendants were falsely telling patients that long-term beds were unavailable and discharging them once their payment source changed from a Medicare Part A to a less lucrative source. *Ickes v. Nexcare Health Sys., L.L.C.*, 178 F. Supp. 3d 578, 594 (E.D. Mich. 2016). Likewise, in *Georgandellis v. Holzer Clinic, Inc.*, 2009 WL 1585772, at *4, 10 (S.D. Ohio June 5, 2009) the plaintiff sufficiently alleged protected activity by pleading that he reported to officials at his clinic that the clinic was billing the government for incompetent care and work that was never performed. Plaintiff lodged numerous internal complaints with the highest echelon of MKC leadership—its Board of Directors—over the course of several years regarding Defendants' fraudulent billing practices. For years prior and in the days leading up to his termination, Plaintiff complained that Defendants were defrauding the government by billing for improper, incompetent, and unnecessary procedures, or for work that simply was not performed.

### 2.      Plaintiff's Complaints Put Defendants on Notice that he was Concerned about Fraud on the Government

Plaintiff's reports went directly to MKC's Board of Directors. He was not required to explicitly label the behaviors he opposed as "fraud" or "illegal" to engage in protected activity. *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 516 (6th Cir. 2000) (plaintiff need not use formal words of "illegality" or "fraud"); *see also Mehlman*, 2021 WL 3560571, at *5 (notice to employer need not explicitly characterize

concerns as involving false claims against the government). Generally, where courts have found a question of fact as to a plaintiff's engagement in protected activity, there is evidence that the core of the plaintiff's concern was a suspicion of fraud—for example of overcharging the government for claims which should not have been billed. *U.S. ex rel. Lockyer v. Hawaii Pac. Health*, 490 F. Supp. 2d 1062, 1084 (D. Haw. 2007), *aff'd in part sub nom. U.S. ex rel. Lockyer v. Hawaii Pac. Health Grp. Plan for Emps. of Hawaii Pac. Health*, 343 F. App'x 279 (9th Cir. 2009). As in this case, an employee who complains about internal wrongdoing that could reasonably be a violation of the FCA and could lead to a viable FCA action engaged in protected activity. *Bonewitz v. NewQuest, LLC*, 2015 WL 1825375, at *6 (M.D. Tenn. Apr. 22, 2015).

Plaintiff satisfied this test by complaining about activities that could lead to a viable FCA action, and which had an obvious nexus to such an action, such as his complaints that MKC physicians billed the government for treatment that never occurred. ECF No. 23, PageID.149, 151, 49-50, ¶¶ 57-60. Likewise, Plaintiff's complaints that Defendants sought to maximize government reimbursements via fraudulent billings put them on notice that he was concerned about fraud. ECF No. 23, PageID.147-155, ¶¶ 40, 44-48, 53-56, 62-66, 69-73. Plaintiff pled that the connection between Defendants' fraudulent practices and their ability to increase revenues from government billings, as well as their strong financial motivations to do so were well understood. These connections were the basis of his complaints, the core of which was suspected fraud. *Id.* at PageID.148, 159 ¶¶ 45-47, 93.

13

Finally, Plaintiff does not rest on conclusory or vague allegations, but instead pled that his complaints spoke to specific violations involving specific patients or groups of patients, for example African American patients of Defendant Dr. Al-Ejel who were placed on in-center hemodialysis to increase revenue. As a matter of law, his written and verbal complaints to Defendants, including the Defendant MKC Board members were engaged in wrongdoing were undoubtedly efforts to stop FCA violations. *Mikhaeil*, 2015 WL 778179, at *7.

### C.   Plaintiff Pled a Causal Nexus Between his Protected Activity and his Termination

Plaintiff must show "there was a causal connection between the protected activity and the adverse action." *Scott v. Metro. Health Corp.*, 234 Fed.Appx. 341, 346 (6th Cir.2007); see also *Ickes*, 178 F. Supp. 3d at 595 (Sixth Circuit rejected a "but-for causation standard"). In *Ickes*, plaintiff established causation because she was not fired until after a meeting when she raised defendants' fraudulent activities. *Id.* at 596. Similarly, Plaintiff alleged he was fired after complaining to MKC leadership about Defendants billing the government for unnecessary, improper, and incompetent medical procedures (some of which were perpetrated via race discrimination) as well as for medical care which did not occur. ECF No. 23, PageID.154, 156-158 ¶¶ 68, 78-87, 93-95. His termination came less than a week after his last complaint of fraudulent billing. The termination letter unambiguously states that Defendants terminated

14

Plaintiff's employment because they would not tolerate his complaints, which they stated brought "disrepute" to MKC and impacted its "cohesiveness".

Defendants falsely claim that "virtually all" of Plaintiff's protected activity occurred "years before his termination". ECF No. 28, PageID.227. To the contrary, Plaintiff alleges repeated complaints in a manner reflecting his pattern of escalating concern, ending in his termination just days after his last complaint. *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 102 (D.D.C. 2014) (rejecting argument that causation not shown where there was a three-year gap between first report of fraud and termination where there were multiple reports, the last being three months prior to termination).

But Plaintiff does not rely on temporal proximity alone. He has other evidence that demonstrate causation. In August 2021, after Plaintiff complained about how MKC engaged in fraudulent billing by targeting patients for in-center hemodialysis based on race, MKC's Board President, Defendant Dr. Al-Saghir, told him that if he did not "believe" in the business model, Defendants would precipitate his "exit strategy." ECF No. 23, PageID.156-157, ¶ 81. Defendant Dr. Al-Saghir told Plaintiff that he was already in touch with MKC's attorneys to discuss his ouster. *Id.* Additionally, after MKC determined that it would be costly to lawfully negotiate Plaintiff's severance as a fully vested partner, in late October 2021, they effectuated a strategy to try to strip him of this status. *Id.* at PageID.157, ¶¶ 82-83. The termination letter also contains evidence of causation. It states that Plaintiff was fired because of his internal complaints of

15

fraudulent billing, race discrimination, and malpractice, which Defendants claimed impacted "cohesiveness" and brought "disrepute to the group". *Id.* at PageID.157-158, ¶¶ 86-87. Finally, Defendants responded to Plaintiff's complaints of fraudulent billing by calling him "disruptive" (*Id.* at PageID.155-156, ¶¶ 74, 78) telling him he was a "bad businessman" (*Id.* at PageID.156, ¶ 78), that he "did not understand the business of medicine" (*id.*) and admonishing him to "stop sending negative emails…" (PageID.154, ¶ 67). In *Georgandellis v. Holzer Clinic, Inc.,* the defendant's similar allegations that the plaintiff was "disruptive" and had "anger management issues" and "poor bedside manners" showed causation. 2009 WL 1585772, at *12.

In addition to the above evidence, as a matter of law, the timing of Plaintiff's complaints demonstrates causation.  Where an adverse action occurs very close in time after an employer learns of a protected activity, the temporal proximity between the events is significant enough to be evidence causation for the purposes of satisfying the prima facie case. *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008); *see also Mikhaeil*, 2015 WL 778179, at *9 (causation shown where plaintiff was terminated two weeks after making a report of Medicare fraud); *see also Dye v. Office of the Racing Comm'n,* 702 F.3d 286, 306 (6th Cir.2012) (lapse of two months demonstrated causation, which is satisfied "where the adverse employment action occurred within a matter of months, or less, of the protected activity"). In *Mehlman*, 2021 WL 3560571, at *7 an inference of causation that could have arisen from close temporal proximity was undermined by other evidence; it was not insufficient as a matter of law.

16

During July and August 2021, Plaintiff complained that MKC physicians were funneling large numbers of non-white patients into fast, high-volume, poor quality, medically unnecessary or improper in-center hemodialysis in order to fraudulently bill the government. *Id.* at PageID.152, ¶ 62. MKC physicians were intentionally targeting non-white populations to further these fraudulent billing practices. *Id.* at PageID.155-156, ¶ 76. Defendants began planning and taking steps toward his termination in August 2021, almost immediately after receiving his July and August 2021 complaints. ECF No. 23, PageID.151-152, 155-156, ¶¶ 57, 62, 75-80.

Defendants terminated Plaintiff's employment with MKC on November 4, 2021. ECF No. 23, PageID.157, ¶ 84. His last complaint of fraudulent billing was less than a week before he was fired. *Id.* Less than a week before Defendants fired him, Plaintiff told the Board that an MKC physician had given incompetent treatment that he believed amounted to malpractice. Plaintiff complained that the malpractice was caused by the doctor's drive to fraudulently bill the government. *Id.* at PageID.152-153, ¶¶ 62-66. The crux of this complaint was that MKC physicians, including the one he credibly accused of malpractice, were providing incompetent or otherwise improper care so they could maximize their government billings. *Id.* Plaintiff alleges that these complaints were the last straw for Defendants, who initiated their plan to remove him in August 2021. *Id.* at PageID.156-157, ¶¶ 78-85.

In *Pitts v. Howard Univ.*, 13 F.Supp.3d 14, 16–17, 19–21, 2014 WL 69032, at *1, *4 (D.D.C.2014), the court held that causal connection could be demonstrated by

17

evidence that the plaintiff was demoted one year after raising concerns about his employer's tax practices. Here, Plaintiff alleged that while he engaged in protected activity on a regular basis dating back to 2018, his complaints proliferated in the time leading up to this termination. ECF No. 23, PageID.147-156.

### D. The Individual Doctors are Properly Named as Defendants to Plaintiff's FCA Retaliation and Michigan Medicaid False Claims Act ("MMFCA")

Defendants are correct that in the private sector, liability for retaliation prohibited by 31 U.S.C.A. § 3730(h) generally extends only to the corporate entity or formal employer. However, an exception to this general rule exists where, as in this case, the individual defendants are the "de facto" employer. *El-khalil v. Tedeschi*, 2019 WL 2325610, at *3 (E.D. Mich. May 31, 2019) (dismissing suit against individuals who the plaintiff alleged were "merely colleagues"). This Court has held that where, as here, a plaintiff can show that a corporate officer is the plaintiff's "de facto" employer, a § 3730(h) claim may be brought against an individual corporate officer. *Id.; see also* ECF No. 23, PageID.142-143, ¶14.

A corporate officer is a "de facto" employer if they control the corporation's decision making. In *Mruz v. Caring, Inc.*, (cited approvingly by this Court in *El-khalil*) the court denied a motion to dismiss an individual defendant because "she is alleged to have dominated and dictated the actions of the CARING Corporations and their boards, and to have been conducting the affairs of the CARING Corporations in a way which benefitted her." 991 F. Supp. 701, 710 (D.N.J. 1998). Likewise, in *Palladino ex rel.*

18

*U.S. v. VNA of S. New Jersey, Inc.*, the court held that an individual may be liable if they "dominated and dictated the actions of the defendant corporations and their boards." 68 F. Supp. 2d 455, 464 (D.N.J. 1999). Here, Plaintiff pled that Defendants, as members of the Board of Directors, exercised a high degree of control over his employment, controlled corporate decision-making, and dominated and dictated the actions of MKC in a way that benefitted them, including as to his termination. ECF No. 23, PageID.142-143, ¶ 14.

Courts have also held that an FCA retaliation claim can be pursued against individuals who caused the plaintiff's discharge but who were not their immediate employer at the time of the adverse action. In *U.S. ex rel. Kent v. Aiello*, an FCA retaliation action was maintained against two individuals who had influenced a subsequent employer to fire the plaintiff. 836 F. Supp. 720, 724-5 (E.D. Cal. 1993). Similarly, in *Nguyen v. City of Cleveland*, an FCA retaliation claim was maintained against a third-party who caused the plaintiff's termination due to their belief that the plaintiff's protected conduct was affecting them. 121 F. Supp. 2d 643, 648-9 (N.D. Ohio 2000). The same applies here, where Defendants caused Plaintiff's termination because they believed his credible accusations of fraudulent billing negatively affected them. ECF No. 23, PageID.142-143, 154, 156-158 ¶¶ 14, 67-68, 78-80, 86-87.

The individual Defendants make up the MKC Board of Directors. ECF No. 23, PageID.141-142, ¶¶ 7-13. Contrary to Defendants' assertions, Plaintiff claims that the corporate entity's decision was dominated and dictated by the individual Defendants.

PageID.142-143, 156-157, ¶¶ 14, 79-84. It is axiomatic and undisputed that Defendant MKC could only have terminated Plaintiff via the actions of the individual Defendants. Plaintiff's Contract of Employment, which was effectuated by the then- "President" of the Board of Directors on behalf of the other Board members and MKC, underscores this point. ECF No. 23-1, PageID.182. The individual Defendants and the corporate entity employed Plaintiff and retaliated against him. ECF No. 1, PageID.16, 142-143, 158-159 ¶¶ 14, 85, 90, 94-95. This action may also be maintained against the individual Defendants because they influenced and drove the decision to fire Plaintiff because of their belief that his protected conduct posed a threat to them.

As to the MMFCA, Defendants cite no case law interpreting the MMFCA to prohibit individuals from being considered "employers" under the statute if they meet the criteria of de facto employers under relevant state and federal law. Notably, Michigan law, including ELCRA, recognizes individuals as "employers" for the purposes of retaliation actions.  For all the same reasons set forth above, Plaintiff pled that the individual Defendants meet these criteria, and they were therefore appropriately named in the MMFCA claim.

### E.     Plaintiff Amply Pled Protected Activity and Causation under the Retaliation Provisions of the ELCRA and 42 U.S.C. § 1981

Defendants' arguments that Plaintiff pled no protected activity and that his allegations are too "vague[]" are without merit. Unlike the plaintiff in *Williams v. Michigan Dep't of Health & Hum. Servs.*, Plaintiff provided ample factual details as to the substance

20

of his complaints, who he complained to, and what the resulting adverse employment action was. 2020 WL 4050246, at *6 (E.D. Mich. July 20, 2020). Plaintiff complained to the named Defendant Board members about race discrimination as follows: Plaintiff confronted Defendant Dr. Al-Ejel about discriminating against patients during a Board meeting. ECF No. 23, PageID.154-155, ¶¶ 69-73. In July and August 2021, Plaintiff twice reported to the individual Defendants that a staff member was denied a promotion because of her race. *Id.* at PageID.155-156, ¶¶ 75, 77. In August 2021 he told the named Defendants that MKC physicians appeared to be targeting African American, Latino, and other non-white populations for higher rates of in-center hemodialysis as the source of their fraudulent billing. *Id.* at PageID.155-156, ¶ 76. Finally, on October 29, 2021 Plaintiff complained that MKC physicians were targeting non-white populations in the Pontiac and Providence pods for improper, incompetent, and unnecessary care MKC was fraudulently billing to the government. *Id.* at PageID.153, ¶ 66.

As set forth above, Plaintiff alleged facts showing causation. First, he engaged in protected activity in such close temporal proximity to his termination that causation can be inferred. Defendants began the process of getting rid of him immediately after his July and August 2021 complaints of race discrimination. They terminated his employment days after his last complaint of systematic race discrimination against patients and 3 months after he last complained about race discrimination against employees. *See Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 664-65

(6th Cir. 2020) (collecting cases where causation was found where retaliation was 3 months after protected activity); *see also Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) (temporal proximity alone generally sufficient where protected activity occurs "less than six months" before adverse action). Second, as set forth above, Defendants' other statements and actions towards Plaintiff demonstrate causation. ECF No. 23, PageID.151-152, 154-158, ¶¶ 57, 62, 67, 74, 75-83. *Benison v. Ross*, 765 F.3d 649, 661 (6th Cir. 2014) (even if temporal proximity is not close enough to rely on timing alone, an employee can still couple temporal proximity with other evidence of retaliatory conduct).

### F.   Plaintiff Sufficiently Pled that he Engaged in Protected Activity under the MMFCA

Contrary to Defendant's representations, MCL 400.610(c)(1) does not contain language stating that an internal investigation is not protected activity. The statute lists three types of conduct that are not protected activity, but internal investigations are not among them. *See* Mich. Comp. Laws Ann. § 400.610c (West) (exceptions are: employee who brought a frivolous claim; planned and initiated the conduct upon which the action is brought; or is convicted of criminal conduct arising from a violation of the act). *See Alcona Cnty. v. Wolverine Env't Prod., Inc.*, 233 Mich. App. 238, 247 (1998) (the express mention of one thing in a statute implies the exclusion of other similar things). The language of the MMFCA allows for an interpretation which includes internal reports to supervisors concerning actual or potential violations of the MMFCA.

22

The MMFCA protects two kinds of activity: (1) engagement in lawful acts in the furtherance of an action under the Act and (2) cooperation with or assistance in an investigation under the Act. MCL § 400.610c. The presumption of non-exclusivity arises from the term "include". Canon of statutory construction provides that the phrase "including" in § 400.610c introduces examples, not an exhaustive list of protected activity. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 15 (2012)[1].

Defendants' argument as to MCL 400.610(1) is similarly inapt. This provision empowers the attorney general or an assistant attorney general to investigate violations of the MMFCA, including via the seizure of property and other law enforcement actions. *See* Mich. Comp. Laws Ann. § 400.610 (West). It does not purport to define protected activity, or even an "investigation" under the act. Defendant provides no federal or Michigan case law holding that an internal investigation is not protected activity. Plaintiff satisfied the protected activity requirement by pleading that he investigated Defendants' practices that led to false claims and confronted them with his findings, which led to his termination. In *U.S. ex rel. Yanity v. J & B Med. Supply Co.*, 2012 WL 4811288, at *6 (E.D. Mich. Oct. 10, 2012) the plaintiff maintained an MMFCA claim past the pleadings stage based on nearly identical allegations, that the plaintiff internally investigated activities prohibited by the MMFCA.

---

[1] PDF of the publication is available online at
https://www.mobt3ath.com/uplode/book/book-67921.pdf

## G. Plaintiff's Public Policy Tort Claim was Properly Pled

Neither of the cases Defendants cite hold that "just-cause" employees cannot be fired in violation of Michigan's public policy. In *Clifford v. Cactus Drilling Corp.*, Michigan's Supreme Court held that "some grounds for discharging an employee are so contrary to public policy as to be actionable". 419 Mich. 356, 360, 353 (1984). It did not hold that "just cause" employees are prohibited from bringing public policy tort claims under Michigan law. Likewise, the *Suchodolski* court repeated this same general principle, and added that most often the actionable grounds for termination "are found in explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty," or "where the alleged reason was the failure or refusal to violate a law in the course of employment" or "when the reason for a discharge was the employee's exercise of a right conferred by a well-established legislative enactment". *Suchodolski v. Michigan Consol. Gas Co.*, 412 Mich. 692, 695-96 (1982). Defendants point to no language from *Suchodolski* or *Clifford* holding that "just cause" employees cannot be terminated in violation of Michigan public policy. In *Mojica v. United Parcel Serv., Inc.*, 483 F. App'x 115, 116 (6th Cir. 2012) the Sixth Circuit confirmed that based on the absence of any published, controlling opinions to the contrary, this remains an open question of law. Nor do defendants cite any law holding that a public policy tort claim could not arise from a "just cause" employer using a contractual provision as a pretext for an "actionable"

ground for termination under Michigan public policy. Indeed, such a conclusion would be illogical. Plaintiff's public policy tort claim is actionable.

### H.   Plaintiff Sufficiently Pled that he Made Reports of Malpractice in Count III and Named the Individual Defendants

Defendants' arguments are a rejection of the principle of notice pleading, under which Plaintiff is required to allege a "short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). In *HDC, LLC v. City of Ann Arbor,* the Sixth Circuit confirmed that it would be "inaccurate to read [*Twombly* and *Iqbal*] so narrowly as to be the death of notice pleading and [the court accordingly] recognize[d] the continuing viability of the 'short and plain' language of Federal Rule of Civil Procedure 8." *See* 675 F.3d 608, 614 (6th Cir. 2012). Plaintiff met this standard. He complained to the MKC Board of Directors that in 2018, an MKC physician engaged in malpractice leading to a patient's death. ECF No. 23, PageID.149-150, ¶ 52. Plaintiff further pled that on October 29 and 30, 2021, he told the Defendant Board members that:

> Defendant Dr. Al-Ejel "had provided <u>negligent and incompetent</u> medical care to a patient that resulted in the patient progressing to End Stage Renal Disease…that Dr. Al-Ejel had <u>provided medical care that failed to meet the required degree of skill and standard [of] care</u>, resulting in serious harm to the patient." PageID.152, ¶¶ 63-64 (emphasis added).

These paragraphs closely mirror the definitions of malpractice Defendants set forth in their brief. ECF No. 28, PageID.237. Plaintiff also pled that throughout 2018-2021, he reported other instances of malpractice, including when MKC physicians did not

actually consult with patients despite being required to do so under the requisite standard of care set by law and/or regulation. ECF No. 1, PageID.149, 151 ¶¶ 49-51, 57-60. Defendants do not dispute that MKC is a "health facility or agency" subject to the anti-retaliation provisions of MCL 333.20176a. *See also id.* at PageID.141-143, ¶¶ 3-14. Defendants cited no law, nor is Plaintiff aware of any, that as high-ranking corporate officers, Defendants, who dominated and dictated the actions of MKC and conducted its affairs in a way that benefitted them, cannot be considered employers for the purposes of a public policy tort claim.

## I.    Plaintiff Properly Named the Individual Defendants in his Breach of Contract Claim

It is undisputed that MKC acts through its Board of Directors, including as to Plaintiff's termination, and that the individual Defendants participated, directly or by proxy, in terminating Plaintiff. For another example, the Board President entered into the contract of employment on behalf of MKC. ECF No. 23-1, PageID.182. Under Michigan law, "[i]t is beyond question that a corporate employee or official is personally liable for all tortious or criminal acts in which he participates, regardless of whether he was acting on his own behalf or on behalf of the corporation. *Att'y Gen. v. Ankersen*, 148 Mich. App. 524, 557 (1986) (collecting cases). Additionally, "[o]fficers of a corporation may be held individually liable when they personally cause their corporation to act unlawfully." *Dep't of Agric. v. Appletree Mktg., L.L.C.*, 485 Mich. 1, 17–18 (2010). There is no law precluding Defendants from being named in Plaintiff's

breach of contract claim. *See All. Assocs., L.C. v. All. Shippers, Inc.*, 2006 WL 1506687, at

*4-6 (Mich. Ct. App. June 1, 2006) (breach of contract and other contractual claims

properly maintained against individual corporate officers).

Dated: August 23, 2022

**DEBORAH GORDON LAW**
/s/ Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Molly Savage (P84472)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
msavage@deborahgordonlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2022, I electronically filed with the
foregoing Response with the Clerk of the Court using the ECF system which will send
notification of such filing to all counsel of record.

**DEBORAH GORDON LAW**
/s/Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Molly Savage (P84472)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
msavage@deborahgordonlaw.com