```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3                           —   —   —

     JEFFREY M. GOLD, M.D.,
 4
                 Plaintiff,
 5
       v.                              Case No. 22-10699
 6
     MICHIGAN KIDNEY CONSULTANTS,      Hon. Matthew F. Leitman
 7   P.C., et al.,

 8               Defendants.
     _____/
 9
                        MOTION TO DISMISS
10
               BEFORE THE HONORABLE MATTHEW F. LEITMAN
11                  United States District Judge
              Theodore Levin United States Courthouse
12                 231 West Lafayette Boulevard
                        Detroit, Michigan
13                  Friday, February 3, 2023

14   APPEARANCES:

15   For the Plaintiff:      DEBORAH L. GORDON
                             ELIZABETH ANN MARZOTTO TAYLOR
16                           DEBORAH GORDON LAW
                             33 Bloomfield Hills Parkway, Suite 220
17                           Bloomfield Hills, MI 48304
                             (248) 258-2500
18
     For the Defendants:     MARGO W. O'DONNELL
19                           BENESCH, FRIEDLANDER, COPLAN & ARONOFF
                             71 S. Wacker, Suite 1900
20                           Chicago, IL 60606
                             (312) 212-4949
21
                             ANTHONY J. KOCHIS
22                           WOLFSON, BOLTON, KOCHIS, PLLC
                             3150 Livernois, Suite 275
23                           Troy, MI 48083
                             (248) 247-7105
24

25        To obtain a copy of this official transcript, contact:
              Robert L. Smith, Official Court Reporter
            (313) 234-2612 • robert_smith@mied.uscourts.gov
```

1                           TABLE OF CONTENTS

2     MATTER                                                    PAGE

3     MOTION TO DISMISS FIRST AMENDED COMPLAINT
      AS TO COUNT 1
4         Motion by Ms. O'Donnell........................... 4
          Response by Ms. Taylor............................23
5         Reply by Ms. O'Donnell............................30
          Ruling by the Court...............................33
6
      AS TO COUNT 2
7         Motion by Ms. O'Donnell...........................36
          Response by Ms. Taylor............................48
8         Ruling by the Court...............................49

9     AS TO COUNT 3
          Response by Ms. Taylor............................50
10        Reply by Ms. O'Donnell............................62
          Withdrawn.........................................68
11
      AS TO COUNT 4
12        Ruling by the Court...............................63

13    AS TO COUNT 5
          Motion by Ms. O'Donnell...........................63
14        Response by Ms. Taylor............................64
          Ruling by the Court...............................66
15
      as to Count 6
16        Motion by Ms. O'Donnell...........................67
          Ruling by the Court...............................67
17

18

19

20

21

22

23

24

25

*Motion to Dismiss • February 3, 2023*

```
 1 │ Detroit, Michigan
 2 │ Friday, February 3, 2023
 3 │ at about 9:30 a.m.
 4 │                         —   —   —
 5 │           (Court and Counsel present.)
 6 │           THE LAW CLERK:  All rise.
 7 │           The United States District Court for the Eastern
 8 │ District of Michigan is now in session, the Honorable
 9 │ Matthew F. Leitman, United States District Judge, presiding.
10 │           You may be seated.
11 │           The Court calls Case No. 22-10699, Gold, MD v.
12 │ Michigan Kidney Consultants, PC, et al.
13 │           Counsel, please state your appearances for the
14 │ record.
15 │           MS. TAYLOR:  Elizabeth Marzotto Taylor on behalf of
16 │ the plaintiff.
17 │           MS. GORDON:  Deborah Gordon on behalf of the
18 │ plaintiff, and with me, Your Honor, is Dr. Jeff Gold, the
19 │ plaintiff.
20 │           THE COURT:  All right.  Welcome to all of you.
21 │           MS. O'DONNELL:  Margo Wolf O'Donnell on behalf of
22 │ the defendants.
23 │           MR. KOCHIS:  Good morning, Your Honor.
24 │ Anthony Kochis, I'm local counsel for the defendants.
25 │           THE COURT:  All right.  Good morning.  Welcome to
```

1    you.

2            Hey, Jeremy, would you come here for one sec?  Come

3    around here.

4            (An off-the-record discussion was held at

5            9:31 a.m.)

6            THE COURT:  All right.  We're here this morning for

7    argument on the motion to dismiss that the defendants filed.

8    Who will be arguing this for you guys?  Ms. O'Donnell.

9            MS. O'DONNELL:  Margo Wolf O'Donnell on behalf of

10   the defendants.

11           THE COURT:  All right.  Do you mind coming to the

12   podium?

13           MS. O'DONNELL:  I do not.

14           THE COURT:  I think -- I don't think you've

15   appeared before me before, but just a couple thoughts here.

16           I do best in bite-size chunks, so when I'm dealing

17   with a motion to dismiss a multi-count complaint, what I like

18   to do is start with the first claim that you're moving to

19   dismiss, hear from you, and then hear from the plaintiffs.

20   And then the other thing I like to do is to start with my

21   questions on a particular claim, and then once you answer my

22   questions, I'd be pleased to hear any additional argument

23   that you have.  All right.

24           MS. O'DONNELL:  All right.  Thank you.

25           THE COURT:  Does that work for you?

1          MS. O'DONNELL:  Yes, that works fine.

2          THE COURT:  I always ask because I'm worried

3    sometimes people come in here with some brilliant

4    mind-blowing argument and I've screwed everything up, and I

5    don't want to do that.

6          MS. O'DONNELL:  Well, we want to answer your

7    questions.

8          THE COURT:  All right.  So I want to start with the

9    motion to dismiss the retaliation claims.  And one of your

10   primary arguments there is that the plaintiff has failed to

11   allege that he engaged in protected activity.

12         MS. O'DONNELL:  Yes, under the FCA -- the Count 1,

13   the FCA retaliation claim, yes.

14         THE COURT:  All right.  I'm pulling up my copy of

15   the complaint.

16         MS. O'DONNELL:  Yes, I've got it, too.

17         THE COURT:  And I used my highlighters pink and

18   yellow, and -- I mean, let me put this simply, it looks like

19   there's a hell of a lot of protected activity that's alleged

20   in this complaint.  You guys allege -- or you guys argue that

21   maybe he didn't connect it to the government or he didn't

22   talk about fraud.  He says he did both, and he says he did

23   both, right up through his termination.  What's not enough

24   here?

25         MS. O'DONNELL:  Well, what's not enough is we can

```
 1    drill down into what exactly is the issue with the productive
 2    model, what are the business issues here, and whether -- what
 3    are -- what constitutes fraud under the FCA Retaliation Act
 4    itself.
 5          So even if you look to turn to page 14 of the
 6    amended complaint, allegations 66 through 68, I mean, here we
 7    see what's really at issue here, with respect to his
 8    termination.  Even plaintiff, himself, says plaintiff was
 9    terminated based solely on the complaints he continually made
10    as to poor patient care and quality.
11          Now --
12          THE COURT:  Where are you looking?
13          MS. O'DONNELL:  I'm looking at allegation 68 on
14    page 15 -- 14 and 15, which constitutes the back and forth,
15    allegedly.
16          And just for the benefit my clients here, too, we
17    are taking the allegations of their complaint to be true, as
18    you know.  And while my clients are ready to vehemently deny
19    everything, I'm just here to talk about the allegations.
20          And in allegation 66, there is an excerpt letter
21    that he wrote and --
22          THE COURT:  Can I just interrupt for a sec?
23          MS. O'DONNELL:  Yes.
24          THE COURT:  There are certain excerpts of e-mails
25    and letters and stuff in here.
```

```
 1              MS. O'DONNELL:  Uh-huh.

 2              THE COURT:  Just for the sake of this question --

 3              MS. O'DONNELL:  Yes.

 4              THE COURT:  -- only for the sake of this

 5    question --

 6              MS. O'DONNELL:  Yes.

 7              THE COURT:  -- assume that I agree with you that

 8    the cutout text that's in here doesn't do it.

 9              MS. O'DONNELL:  Yes.

10              THE COURT:  There's a lot of other allegations that

11    seem to capture oral communications --

12              MS. O'DONNELL:  Right.

13              THE COURT:  -- and refer to fraudulent billing.  So

14    why aren't those enough?

15              MS. O'DONNELL:  I think the fraudulent billing

16    pertains to two sorts of issues, all of which were not close

17    in time to the termination itself.

18              THE COURT:  Look, that goes to causation and we'll

19    talk about that in a second.

20              MS. O'DONNELL:  Yeah.

21              THE COURT:  But first whether there was protected

22    activity, I mean, he just repeatedly alleges he complained

23    about fraudulent billing to the government, including

24    fraudulently billing for these wave bys.  I'm struggling with

25    why that's not enough.  It stands in such stark contrast to
```

1    the two district court cases that you primarily rely on from

2    Judge Breen and Judge Dlott --

3            MS. O'DONNELL:  Yes.

4            THE COURT:  -- where they were -- both my

5    colleagues in Jackson, Tennessee and Cincinnati were talking

6    about plaintiffs who were complaining about -- one guy didn't

7    like the way he was compensated, thought he was getting

8    screwed, not that the government was getting screwed, and

9    then somebody else wasn't complaining about fraud.  This

10   seems to me to stand in sharp contrast to that.

11           MS. O'DONNELL:  I mean, I believe the wave round

12   allegations are conclusory, and also, there isn't any

13   allegation that the consultations themselves -- I mean, while

14   they may have been quick, that they actually didn't take

15   place.  I mean, they have been too quick --

16           THE COURT:  He's literally alleging that all they

17   did is walk through and wave and bill for it.

18           MS. O'DONNELL:  Yes, but he's not alleging because

19   they walked through and the consultations themselves were so

20   quick that they were billed --  that the bill was necessarily

21   fraudulent, because they were so quick.  I mean, I think the

22   basic issue here is the sort of difference of opinion with

23   respect to how the business should be run.  Are they

24   consulting with the patients too quickly?  Is the

25   productivity model, itself, which actually is in compliance

1    with Medicare, is that model, itself, the right or wrong way

2    to conduct a medical practice?  And that's the issue that led

3    to his termination as well, sort of a difference of opinion

4    with respect to the business, based on the allegations of the

5    complaint, you know, they are more.  But the wave round

6    itself is just another part of the issue with the

7    productivity model, which is not fraud, itself, it's

8    consulting with the patients too quickly.  And I know he

9    bandies about the word fraud --

10           THE COURT:  Fraud is waving at a patient or saying

11    hello and then billing the government for it, that's fraud.

12           MS. O'DONNELL:  Well, I don't think there's any

13    allegations to say, unfortunately, that consulting with a

14    patient too quickly, itself, is fraud.  I mean, and I

15    think --

16           THE COURT:  I'm not a Medicare expert, but come on.

17    It would be shocking if the Medicare guidelines said, yeah,

18    go ahead and bill us for waving at somebody.  I mean, come

19    on.

20           MS. O'DONNELL:  I don't think they say go ahead and

21    bill us for waving at someone.  I think the issue here is,

22    were they consulting -- and they will be denying this, of

23    course, but were they consulting in too quickly of a fashion

24    and --

25           THE COURT:  For purposes of today, I'm willing to

1    assume that your position with respect to all the allegations

2    in this complaint mirrors my all-time --

3              MS. O'DONNELL:  I know.

4              THE COURT:  -- favorite opening statement from

5    Joe Pesci --

6              MS. O'DONNELL:  Yeah.

7              THE COURT:  -- in My Cousin Vinny --

8              MS. O'DONNELL:  Right.

9              THE COURT:  -- that this is all bullshit.  I'm

10   willing to accept that that's your position on the facts.

11             MS. O'DONNELL:  Okay.

12             THE COURT:  So today, I'm only dealing with the

13   allegations.

14             MS. O'DONNELL:  And also -- I mean, I think, then,

15   we look -- I mean, I think you're honing in on 59 and 60, on

16   page 12, which are the allegations regarding the wave rounds.

17   And then I think if you look at those allegations, too, it

18   says Dr. Gold complained about this practice, but it doesn't

19   say he complained about this practice from a billing

20   perspective, with respect to those two allegations, in

21   particular.

22             I mean, he's not saying to them -- and I know

23   that's a different element of the claim, putting them on

24   notice that he thinks this waving or consulting is somehow a

25   violation of Medicare.  I know --

*Motion to Dismiss • February 3, 2023*

1    THE COURT:  Look, if you put 59 and 60 together and
2  you read them reasonably, but in the light most favorable to
3  him, it says his investigation revealed that they were waving
4  and saying hello and billing the government for that, and
5  then 60 starts off by saying he complained about this
6  practice.
7    MS. O'DONNELL:  But he doesn't say anything about
8  complained about billing with respect to the practice.  And
9  then on 61, the next page, it says --
10    THE COURT:  Look, this is defined in 59.  It seems
11  to me that you could reasonably infer that the practice is
12  billing for waving.
13    MS. O'DONNELL:  But I think -- I think that with
14  respect to our at issue on an 12(b)(6) claim, the FCA
15  requires more than a reasonable inferring.  There
16  isn't -- there must be a reason for this.  There isn't a
17  specific allegation that says he objected to the billing of
18  these wave rounds because they violated Medicare.  I mean,
19  there isn't anything in here about how he specifically
20  objected to these wave rounds, and there certainly is more
21  specificity as to how he objected to the productivity model,
22  which really was the issue between them.  I mean,
23  productivity is in compliance with Medicare.  Working quickly
24  is in compliance with Medicare.
25    THE COURT:  Let me ask you my favorite question.

1          MS. O'DONNELL:  Okay.

2          THE COURT:  And this is a question that I tell

3   everybody, that still haunts me from my days of arguing in

4   the Sixth Circuit.

5          MS. O'DONNELL:  Uh-huh.

6          THE COURT:  If you ever get up there on this case

7   and you get Judge Karen Nelson Moore on your panel, you can

8   bet she's going to ask you a question that sounds kind of

9   like this.

10          MS. O'DONNELL:  Okay.

11          THE COURT:  If I'm writing a decision in your

12   favor --

13          MS. O'DONNELL:  Right.

14          THE COURT:  -- and I were to right this line in my

15   opinion, "The defendants argue that these allegations fall

16   short of protected act."

17          MS. O'DONNELL:  Yes.

18          THE COURT:  "Of course they're right.  That's

19   exactly what the federal court held in..." blank.  What case

20   would I put in that line?

21          MS. O'DONNELL:  Well, I think we cited, and I know

22   *Fakorede* and also --

23          THE COURT:  Look, those are the two cases that I

24   talked about.

25          MS. O'DONNELL:  Yes.

```
 1          THE COURT:  Those are the Judge Breen and
 2   Judge Dlott decisions, I refer to them by judge rather than
 3   name, but those strike me as quite distinguishable.
 4          MS. O'DONNELL:  Well, they didn't occur in the
 5   healthcare context.  I'm not sure we've been able to find a
 6   case exactly on point here, with respect to the productivity
 7   model, and both of those cases were urging them, you know,
 8   with respect to audits and the way they --
 9          THE COURT:  Is there any case that you cited where
10   somebody repeatedly alleged that they complained about
11   fraudulent billing and things that should, quote, not be
12   billed to the government and a court said that wasn't
13   protected activity?
14          MS. O'DONNELL:  But I don't think here -- I just
15   respectfully disagree.  He's not saying that these particular
16   wave rounds were fraudulently billing the government or that
17   he notified them that that was his position.
18          THE COURT:  All right.  Look, let's respectfully
19   agree to disagree on that.  Again, look at all of my pink in
20   here.
21          MS. O'DONNELL:  Uh-huh.
22          THE COURT:  I highlighted every time he says he was
23   complaining about fraudulent billing to the government.  And
24   so I'm asking, is there any case, at all, where one of my
25   colleagues or an appellate panel has said, yeah, there's a
```

```
 1    lot of reference to complaining about fraudulent billing, but
 2    that's not protected activity?
 3              MS. O'DONNELL:  Well, I don't think there's a case
 4    that specifically says that, because -- but I don't think
 5    he's alleging that this was, itself, fraudulent billing under
 6    Medicare.  I don't see that in these allegations, with
 7    respect to the wave rounds.  I don't think there's a case on
 8    point --
 9              THE COURT:  Again, let's --
10              MS. O'DONNELL:  -- that we have been able to find.
11              THE COURT:  Let's separate out the wave rounds.
12              MS. O'DONNELL:  Okay.
13              THE COURT:  That's what I was trying to get at.
14              MS. O'DONNELL:  Okay.
15              THE COURT:  So I'm willing to separate out the
16    e-mail correspondence.
17              MS. O'DONNELL:  Thank you.  Okay.
18              THE COURT:  I'm willing to separate out the wave
19    rounds.  But what I was holding up is every other spot in
20    this first amended complaint, where he references fraudulent
21    billing.  Is your argument that that's just conclusory?
22              MS. O'DONNELL:  Yes, because there's only one other
23    spot -- I've read the complaint -- the amended complaint
24    carefully, as you have, too, that involves Dr. Reddy.  I
25    think that's the other spot where there is an allegation --
```

1          THE COURT REPORTER:  The doctor's name again?

2          MS. O'DONNELL:  R-E-D-D-Y.  Otherwise, I think all

3     the allegations, themself, are conclusory, that he bandies

4     about the word "fraudulent" in conjunction with the theory

5     that the productivity model, itself, is somehow fraudulent,

6     when it actually complies with Medicare.  I mean, so I think

7     his main issue here is by complying with Medicare

8     and -- which isn't true -- he somehow -- that he disagrees

9     with their treatment of the patients.  I mean, most of this

10    is a malpractice type issue, a productivity issue, and that's

11    really what's connected to the termination.  I mean, if we

12    agree to disagree on the wave rounds, there isn't any

13    reference to billing issues, even by his own admission, with

14    respect to the termination itself.

15          And I think that the dates here are very conclusory

16    as well, and there isn't anything necessarily connecting any

17    of this -- like conclusory allegation of fraud, which if it

18    were to be possible with Dr. Reddy or these wave rounds,

19    which is conclusory in itself, to the actual termination.

20          THE COURT:  Well, let's talk about that.

21          MS. O'DONNELL:  Okay.

22          THE COURT:  So we're kind of shifting now from the

23    question of whether there was protected activity to your next

24    argument, which is, you say there wasn't, but even if there

25    was, you say there's no sufficient allegation of causal

1    connection --

2             MS. O'DONNELL:  Or notice to the defendants as

3    well.  So I don't see anything here that he told -- I mean,

4    he could have just come right out and alleged this.  He had

5    two chances -- two bites at the apple to specifically allege,

6    I informed the defendants that these actions violated

7    Medicare -- I mean, that seems like a very simple allegation

8    to make -- and that is why they terminated me.  I just don't

9    see that anywhere.  In fact, I see the opposite, that there

10   are issues bandying back and forth, had to do with

11   productivity model which, again, is in compliance with

12   Medicare, but that they had a difference of opinion as to how

13   to run the business.

14            THE COURT:  All right.  Let's go to the issue of

15   causation for a second.

16            MS. O'DONNELL:  Uh-huh.

17            THE COURT:  Why isn't this a fair way to conclude

18   that they have sufficiently alleged causation?  So the

19   complaint alleges that Dr. Gold was making a lot of

20   complaints, both orally and in writing, and the complaint

21   alleges that the defendants responded, among other ways, by

22   characterizing him as destructive -- excuse me, disruptive

23   and instructing him to stop sending negative e-mails.

24            MS. O'DONNELL:  Yes.

25            THE COURT:  And then the complaint alleges that the

1    termination letter says that he's being fired for impacting

2    the cohesiveness of the group and bringing disrepute to the

3    group, in the form of his complaints.

4            MS. O'DONNELL:  Yes.

5            THE COURT:  So why isn't it a fair way to reason,

6    to say the following:  The termination letter doesn't speak

7    at all to his medical performance, so the termination letter

8    must be referring to the way he conducted himself.

9    Therefore, the only question is, did the way he conduct

10   himself amount to protected activity, because they've said

11   that's why we're firing you?  Why isn't that the right

12   way to --

13           MS. O'DONNELL:  Because, first of all, where is the

14   letter.  They didn't attach the letter.

15           THE COURT:  All right.  They don't have to attach

16   the letter.

17           MS. O'DONNELL:  Okay.

18           THE COURT:  They pleaded about it.

19           MS. O'DONNELL:  Okay.  But the --

20           THE COURT:  You could have attached it.  It's

21   a 12(b)(6), you could have responded, so it's not before me

22   today.  This is the allegation that I have.

23           MS. O'DONNELL:  Okay.  Well, I think that when you

24   read the allegations, again, he doesn't say they terminated

25   me because of my objections based on Medicare billing.  I

*Motion to Dismiss • February 3, 2023*

**18**

 1    mean, even he says --

 2              THE COURT:  I want to just focus on my question for

 3    a second.

 4              MS. O'DONNELL:  Yeah, the cohesiveness.

 5              THE COURT:  The argument here is, that they make,

 6    and I'm trying to understand why this isn't a fair way to

 7    look at it, is the defendants, themselves, have said why they

 8    fired me.

 9              MS. O'DONNELL:  Right.

10              THE COURT:  It's not a medical reason, it was what

11    I was saying was impacting cohesiveness.

12              MS. O'DONNELL:  Right.

13              THE COURT:  And so the only question here is --

14              MS. O'DONNELL:  Right.

15              THE COURT:  -- was he saying something that's

16    protected activity, because we know they fired him for what

17    he was saying.  Why isn't that the right way to think about

18    causation?

19              MS. O'DONNELL:  Because I think if you look at the

20    allegations that come later, 66, 67, 68, the plaintiff,

21    himself, alleges what they were saying and why they

22    terminated him.  It was the complaints he continually made as

23    to poor patient care and quality.  And poor patient care and

24    quality, while it's -- you know, we dispute those

25    allegations, that doesn't have to do with false billing under

1    Medicare.

2          THE COURT:  He doesn't say I was fired for making a

3    small subset of my complaints.  He says I was fired for

4    making all of my complaints, and he's saying that, when you

5    piece together his allegations -- I'm sorry.  Let me be more

6    specific.

7          MS. O'DONNELL:  Okay.

8          THE COURT:  He says that the defendants responded

9    to all of his allegations by saying he was disruptive and he

10   was sending negative e-mails, not that they responded to some

11   small subset of his e-mails that way, so --

12         MS. O'DONNELL:  Well, I think that, actually, when

13   he characterizes the back and forth that occurred just prior

14   to his termination, I think we have to hone in on that.  I

15   mean, he alleges, himself, as to what he thinks prompted the

16   termination, and that has to do with the productivity model.

17   I mean, look at the October 29th, 2021 back and forth in

18   allegation 66.  I mean, "Slow down your care enough that you

19   can take appropriate care of people who need us.  Why would

20   someone want more productivity?  Ask yourself how productive,

21   but how well you deliver care."  I mean, none of that says

22   anything about billing.  The biopsy was inadequate.  There's

23   no reference to billing in any of this.  It's reference to

24   biopsies and care.

25         And then Dr. -- you know, the doctor responded

```
 1    angrily to the e-mails, accusing them of improper care,
 2    Dr. Gold, those negative e-mails.  There isn't any sort of
 3    reference to negative e-mails about billing here.  I mean,
 4    there was an opportunity to make that reference here, and
 5    then he was terminated.  So I think that's how we have to
 6    infer why he was terminated.  I mean, they had ample
 7    opportunity to point to some back and forth about fraudulent
 8    billing at this point, but that back and forth doesn't talk
 9    about that, and certainly, they were taking excerpts from
10    communications here.
11         THE COURT:  What about the temporal proximity?  He
12    alleges that he's complaining about this stuff, essentially,
13    right up to the time of his termination.
14         MS. O'DONNELL:  Yeah, but then what he points to
15    what occurred right up to his termination, has to do about
16    the back and forth about proper care, malpractice.  And while
17    that's unfortunate -- we say that's untrue, but, you know,
18    and productivity -- the productivity model that complies with
19    Medicare, there isn't anything in these allegations, in the
20    opportunity to plead, that says that it was improper billing.
21    I can't believe the improper billing.  I mean, there was a
22    lot that they could have included here.  And when he does
23    allege that he made complaints about billing close in time,
24    it's conclusory.  Like, even if the wave rounds, at least
25    three to four times each year, between 2018 and his
```

*1*   termination.  Well, where are those e-mails?  He seemed to

*2*   put other communications in.  Where are those?  Those seem to

*3*   be very important and they are omitted here, I think probably

*4*   purposefully.

*5*        And then when you go to back to Dr. Reddy, he said

*6*   he last complained about her prior to COVID.  So I would give

*7*   them the benefit of the doubt, the inference, that would be

*8*   March 12th, 2020 might be the latest complaint about

*9*   Dr. Reddy, when he was terminated in November of 2021.  I

*10*   mean, he had ample opportunity to connect these allegations

*11*   of fraud -- fraudulent billing that he just throws in the

*12*   complaint, willy-nilly, to his termination, and he just

*13*   doesn't do that.

*14*        THE COURT:  Can I ask you just a curiosity

*15*   question, and you might not know the answer.  In -- do you

*16*   have the amended complaint in front of you?

*17*        MS. O'DONNELL:  Yes.

*18*        THE COURT:  Can you turn to paragraph 82?

*19*        MS. O'DONNELL:  Uh-huh, yes, yes.

*20*        THE COURT:  So paragraph 82 alleges that Dr. Gold

*21*   became fully vested in August 2021.

*22*        MS. O'DONNELL:  Yes.

*23*        THE COURT:  And then paragraph 83 alleges that

*24*   after he became fully vested, there was a vote on a change

*25*   that would make him only 60-percent vested.  Do you know, as

1    we sit here today, from your clients' perspective, is

2    he 100 percent vested or 60?

3         MS. O'DONNELL:  I don't know.  I mean, I certainly

4    could turn around and ask them.  I don't know.

5         THE COURT:  I don't need to know for today.

6         MS. O'DONNELL:  Yeah, okay.  But I do think it's

7    interesting with respect to these allegations, if he really

8    felt there was fraudulent billing under Medicare, why does he

9    become a fully-vested partner?  So I think that -- I think

10   these complaints he was making had to do with differences of

11   opinion with respect to the model, knowing he was -- you

12   know, at this time in August 2021, he became fully vested or

13   had some sort of larger interest in the medical practice.  So

14   then he started writing to them about their business model as

15   he became more a part of it, and that was the issue that led

16   to the difference of opinion and his termination.

17        I mean, there just isn't -- I mean, even though

18   they said fraud, fraud, fraud, wave rounds, I don't see any

19   communication about the wave rounds or issues with billing

20   alleged here, immediately or even in the months -- many

21   months before his termination.  I mean, he says here, he

22   complained about the wave rounds in 2018 and then several

23   times through November 2021.  If that really happened, I

24   would think those allegations would be more specifically in

25   here, and I think it's too conclusory.

1           THE COURT:  Okay.  Is there anything else you want
2     to tell me on this Count 1?
3           MS. O'DONNELL:  Well, also, the individual
4     defendants are not proper parties to this count.  Under the
5     FCA retaliation statute, individuals are not -- cannot be
6     defendants.  And this whole idea of de facto employment, that
7     sort of theory doesn't exist under the FCA retaliation
8     statute, so the individuals should be dismissed out of hand
9     at the outset.
10          THE COURT:  Okay.  Thank you.  I appreciate your
11    argument on that count.
12          MS. O'DONNELL:  Okay.  Thank you.
13          THE COURT:  Who's going to argue for Dr. Gold?
14          MS. TAYLOR:  Good morning, Your Honor.
15          THE COURT:  Hi.  All right.  Can we do the same
16    thing and start with my questions for you?
17          MS. TAYLOR:  Absolutely.
18          THE COURT:  You got a sense from my questions to
19    defense counsel that I think there's enough allegations here
20    on the protected conduct and causation.  Where I think
21    they've got a strong position is with respect to the
22    individual defendants.
23          MS. TAYLOR:  Sure.
24          THE COURT:  And so let me start with maybe the
25    hardest question and then work backwards.  For the sake of

1    this question, I want to make an assumption that I'm not,

2    ultimately, necessarily going to make, but I will make it for

3    the sake of this question.  Let's assume that there is some

4    sort of de facto employment -- de facto employer doctrine

5    that applies under 3730(h).  Ms. O'Donnell told me that much

6    of your protected activity and causation element -- excuse

7    me, allegations were conclusory, and I don't necessarily

8    share that view.  But even if there is a de facto employer

9    exception, it seems to me the only allegations about the

10   de facto employee you guys have are in paragraph 14.  Do I

11   have that right?

12          MS. TAYLOR:  So paragraph 14 is the paragraph where

13   we, you know, set out the de facto employer standard and we

14   plead facts to meet that standard, but there are other

15   allegations in the complaint that talk about the high degree

16   of control over Dr. Gold's termination that the defendants

17   exerted.

18          So I can -- and while I'm looking for those, I can

19   tell you that it's not disputed here, by defendants, that the

20   individual defendants, as members of the board, you know, had

21   to vote and they had to act in order to terminate Dr. Gold's

22   employment, so there's no way that the corporate entity could

23   terminate the employment without the individual board members

24   exerting a high degree of control over that process.

25          In paragraph 90, we assert that all of the --

1          THE COURT:  Hold on.  I do better when I read.

2          MS. TAYLOR:  In paragraph 90 on page 19, we assert

3     that all the defendants, including the individuals, were

4     employees within the meaning --

5          THE COURT:  Hold on.  Look, come on, I mean, you

6     saw my skepticism when Ms. O'Donnell tried to tell me that

7     your allegations weren't enough -- or when she tried to tell

8     me that allegations that seem to be factual and with some

9     meat on them, were conclusory.  My reaction here is the

10     opposite.  Paragraph 90, of all paragraphs, is just parroting

11     the statute.  That could be in any case in this court or any

12     district court in the world.

13          MS. TAYLOR:  Okay.  So I think, in terms of factual

14     allegations, certainly our allegations concerning causation,

15     we have a whole section in the complaint about causation,

16     those factual allegations are pertaining to the actions of

17     the individual defendants, and those indicate that they had

18     improper motives and played a role and essentially drove this

19     termination.

20          THE COURT:  But that's just -- I mean, those are

21     just defendants writ large, all of them.  There's no specific

22     allegations about any particular defendants, are there, in

23     terms of the role in the termination?

24          MS. TAYLOR:  So -- let me see here.  So beginning

25     with paragraph 80, which is another sort of summary

 1   paragraph, as I will call it, where we are introducing the

 2   concepts that the individual defendants, you know, took

 3   actions to plan and effectuate the termination.  We get into

 4   paragraph 81 where defendant doctor is explaining to

 5   plaintiff, in response to one of his complaints, that, you

 6   know, if you don't like our -- the way we do business, you

 7   can go, and, oh, by the way, I'm already in contact with our

 8   lawyer to start planning your exit.  That certainly shows

 9   that, you know, the defendant board members were, you know,

10   taking the reins of the termination process beginning in

11   August of '21, after Dr. Gold's complaints were rolling in.

12           THE COURT:  Is there ever a case where somebody

13   would be terminated by a board of directors, where under your

14   theory, the individual board members might not be subject to

15   liability?

16           So I'm saying the hypothetical here is, assume that

17   somebody is terminated in violation of 37(h) and assume that

18   their termination can only occur by a vote of board of

19   directors.  Under your theory, could the plaintiff sue the

20   individual members of the board every time that happens?

21           MS. TAYLOR:  I don't think so, Your Honor, because

22   this standard about de facto employer is fairly specific.

23   You know, if the members of the board were, you know, merely

24   peers or colleagues, rather than, you know, being in a

25   superior position -- a superior subordinate position, that

```
1    would certainly be a factor.
2            THE COURT:  All right.  Let me ask you this
3    question.  Your allegation -- to be a de facto employer means
4    more than just making a termination decision, right?
5            MS. TAYLOR:  That's right.
6            THE COURT:  So, in other words, I could tell
7    whether somebody is somebody else's de facto employer before
8    a termination, I would look at what's happening during the
9    course of the employment, right?
10           MS. TAYLOR:  Yes, Your Honor, and --
11           THE COURT:  So where are the allegations in here
12   that before Dr. Gold is terminated, these other individuals
13   are somehow, in your words in paragraph 14, exercising a high
14   degree over -- high degree of control over the terms and
15   conditions of his employment?
16           MS. TAYLOR:  So we certainly have allegations
17   concerning all of Dr. Gold's many complaints.  Dr. Gold was
18   addressing his complaints about the conduct of his other
19   colleagues to the members of the board because they were in
20   charge, they were the supervisors.  So that
21   certainly -- there's certainly an inference to be drawn
22   there.
23           With regard to the paragraph 82 and 83, we see here
24   that they are driving a strategy to divest him of his vested
25   status.  They are --
```

```
 1              THE COURT:  What case -- if I was -- let me ask you
 2     the flip side of the question I asked Ms. O'Donnell, and you
 3     will be very well prepared for the Sixth Circuit.  If I'm
 4     going back to my chambers and I'm writing a decision and I
 5     say, "Of course these individuals can be held liable under
 6     the de facto employer theory, that's exactly what the federal
 7     court did in..."  blank, or it's just like -- what case?
 8              MS. TAYLOR:  Your Honor, we cited a case from the
 9     District Court in New Jersey, the Mruz v. Caring, Inc. case,
10     which defined de facto -- the de facto employer standard and
11     declined to dismiss certain defendants from that case.
12              THE COURT:  That case -- there was one defendant
13     and she was personally alleged to have been the person
14     controlling the board and -- is that a difference here?
15              MS. TAYLOR:  I think, Your Honor, that the
16     individual defendants we named here are a similarly
17     controlling the board.  Whether it is more than one person, I
18     don't think that's dispositive.
19              THE COURT:  Why not?  In other words, why isn't the
20     right way to think about this, you're suing these people
21     individually and so I should be able to look at each of them,
22     standing alone, and say, is that person the de facto
23     employer?  And here the only theory in the complaint is that
24     the board, as a whole, made a decision.  Is there any notion
25     that any one of these individuals, standing alone, separate
```

*1*  and apart from the board, could have taken any action, at

*2*  all, with respect to Dr. Gold's employment?

*3*          MS. TAYLOR:  I think that's something we would have

*4*  to explore in discovery, because we don't have access to the

*5*  governing documents for the corporation, but I can say that

*6*  the president of the board signed the termination letter.

*7*          THE COURT:  Does it make any difference to you that

*8*  the *Mruz* case was decided before *Twombly* and *Iqbal* and what

*9*  the court said was simply that -- this is on

*10* page -- 991 F. Supp, page 710, that "it cannot be said that

*11* plaintiffs cannot prove that she was the employer."  The

*12* judge there was using the old prove no set of facts.  Does

*13* that matter?

*14*          MS. TAYLOR:  I hear your point as to the timing of

*15* the opinion, but *Twombly* and *Iqbal* do not do away with the

*16* notice pleading standard.  So I think that, you know, our

*17* position is that we have, you know, met the notice pleading

*18* standard as to this exception to the general rule.

*19*          THE COURT:  Okay.  Is there anything else that you

*20* want to tell me in Count 1?

*21*          MS. TAYLOR:  In Count 1, I would like to draw your

*22* attention to a case that we did not cite in our papers, that

*23* I think --

*24*          THE COURT:  On what issue?

*25*          MS. TAYLOR:  On the issue of notice.

1          THE COURT:  You're winning on that one.

2          MS. TAYLOR:  Okay.  Then in that case, that's fine.

3    Let me just check my notes here.  I don't think that there's

4    anything else, Your Honor.

5          THE COURT:  Thank you.  I appreciate your thoughts.

6          Ms. O'Donnell, do you have anything else to say on

7    Count 1?

8          MS. O'DONNELL:  Yes.  With respect to the de facto

9    employer allegations, we don't see that anything has been

10   pled, other than the conclusory allegations.

11         THE COURT:  You're winning on this issue.

12         MS. O'DONNELL:  Okay.  I know.  Thank you.  It

13   seems I am.

14         But also with respect to the notice issue, I would

15   like to go back to that for a moment, with respect to all the

16   defendants.  I don't think that there's an allegation here

17   that they were specifically on notice as to Dr. Gold's belief

18   that there was Medicare fraud here.  I think the allegations,

19   themselves, are conclusory.  And I know I keep going back to

20   that, but there aren't any specific allegations that he told

21   the defendants that they were engaging in Medicare fraud, and

22   I think that's necessary in order to assert an FCA

23   retaliation claim.

24         THE COURT:  Come on.  Isn't that, unequivocally,

25   not necessary?  That the Sixth Circuit says in the published

1  decision of -- I think it was the *McKenzie* case, that you

2  don't -- there's no magic word, but fraud against the

3  government --

4          MS. O'DONNELL:  Right.

5          THE COURT:  -- is enough.

6          MS. O'DONNELL:  Well, I don't think he's alleging

7  that there's fraud against the government here or that he

8  brought their attention to the fact that there was

9  necessarily fraud against the government.

10          THE COURT:  Come on, look, you've got a lot of

11  serious arguments, but do you want me to count the number of

12  times that he says fraud against the government in the first

13  amended complaint?

14          MS. O'DONNELL:  I think he says it a lot, but I

15  don't think he ever alleges "and I told them that this, in

16  particular, was a fraud against the government, and here is

17  my e-mail where I said that."  I think that the

18  communications where he points to, with specificity as to

19  what he said to them, has nothing to do with any fraud on the

20  government, it has everything to do with their productivity

21  model, which is in compliance with Medicare.  I mean, he had

22  a chance to point to specific instances where he said and

23  this is a fraud on the government, and the complaint -- the

24  amended complaint is completely lacking of those allegations.

25  I think they are entirely conclusory when he says there's not

```
 1    specific dates, he doesn't say that -- he said he complains
 2    of fraud repeatedly, but he doesn't say to whom, specifically
 3    when.  And when we get specific -- when we can hone down,
 4    when he actually does get specific about what he notified
 5    them of and what they went back and forth on it, had nothing
 6    to do with a fraud on the government, it had to do with the
 7    disagreement and how patients are treated, patient care and
 8    the whole productivity model.  He disagreed with how they
 9    were conducting business.  I mean, I don't see anywhere in
10    this amended complaint where they say, I told this person X,
11    Y and Z, certainly not an individual defendant, certainly not
12    any defendant, that this was fraud on the government.  I
13    mean, and the complaint is however --
14              THE COURT:  Let's --
15              MS. O'DONNELL:  -- 33 -- 32 pages long.
16              THE COURT:  What do you say about paragraph 57?
17              MS. O'DONNELL:  Okay.  I think -- first of all,
18    going back to the timing, the last date that he admits that
19    he told the board this was in 2020, that's like --
20              THE COURT:  Would you look at paragraph 57 --
21              MS. O'DONNELL:  Yeah, I'm looking at it -- yes, I'm
22    looking at it right now.  Throughout 2018, 2019, 2020 and up
23    to the date of his termination --
24              THE COURT:  All right.  So we stop right there.
25              MS. O'DONNELL:  Okay.
```

1      THE COURT:  We are past 2020.

2      MS. O'DONNELL:  But I think that these allegations

3  are conclusory.  I think, with respect to when he reported

4  here, there isn't any specifics about when he made those

5  reports, to whom he made those reports.  I mean, this

6  allegation is entirely conclusory.  I don't think it's

7  sufficient to let an FCA retaliation claim go through -- it's

8  a very serious claim -- based on what 57 is, because he

9  certainly is able to point to specific complaints he made

10  elsewhere in the complaint, and if 57 is all we are relying

11  on to let a very serious complaint go through against my

12  clients, I think that doesn't meet the pleading standard.

13      THE COURT:  Okay.  Anything else on Count 1?

14      MS. O'DONNELL:  I think that's all.  Thank you,

15  Your Honor.

16      THE COURT:  I appreciate your arguments, and I

17  appreciate you standing in there in response my questions.

18      Look, I'm going to rule on this motion as we go

19  forward, because I want to get this case going.

20      With respect to the motion to dismiss Count 1, I'm

21  going to grant it in part and deny it in part.  I'm going to

22  deny the motion to dismiss Count 1 to the extent that it

23  seeks to dismiss that count as against the corporate

24  defendant.  The defendants make a number of arguments here.

25  They first argue that there's not a plausible allegation of

 1    protected activity.  In my view, the -- there is many

 2    sufficient allegations of protected activity throughout this

 3    complaint.  I think it is replete with allegations that

 4    Dr. Gold was complaining to the defendants that there was

 5    fraudulent billing to the government, and that -- so, I mean,

 6    I don't need to go through these in detail, as I hit a number

 7    of them in my questions with Ms. O'Donnell.  I think that

 8    more than satisfies the standard set out in *McKenzie v.*

 9    *Bellsouth*, 219 F.3d 508, at 515.

10            Likewise, I think there is sufficient notice to the

11    defendants that Dr. Gold's complaints were related to fraud

12    on the federal government, not just to misconduct.  Again,

13    that is repeatedly alleged in here, that there was fraud

14    against the government and that the defendants were notified

15    about it.

16            I appreciate and respect Ms. O'Donnell's argument

17    that the allegations of fraud are conclusory, but as she

18    noted, we'll agree to disagree, and since I have the pen, the

19    allegations will be deemed sufficient in this case, but I

20    certainly respect and appreciate her argument that they are

21    not.

22            With respect to the defendants' argument that

23    there's not a plausible allegation of a causal connection, I

24    think there is a plausible allegation of a causal connection

25    between the protected activity and the termination.  As I

```
 1  │  explored in my colloquy with Ms. O'Donnell, I think, when you
 2  │  put together the termination letter with the comments that
 3  │  Dr. Gold alleges the doctors made when describing his
 4  │  communications, I think you can make a reasonable inference
 5  │  that he was terminated for what he was saying, and that
 6  │  would, to me, establish a causal connection.
 7  │          Likewise, I think there's temporal proximity
 8  │  alleged here, that the protected activity was continuing very
 9  │  close to the time of his termination.  So you combine those
10  │  two, and I think there's a plausible allegation of a causal
11  │  connection.  So I'm going deny the motion as it relates to
12  │  the corporate entity, but I'm going to grant the motion as it
13  │  relates to the individual defendants.
14  │          I'm not necessarily persuaded that this de facto
15  │  employer doctrine applies in context of 3730(h), but I don't
16  │  need to decide that.  In my view, there are not sufficient
17  │  factual allegations to make it plausible here, that these
18  │  individual defendants were his de facto employer.  There's no
19  │  allegations about control that they were exercising during
20  │  the course of the employment relationship that I could
21  │  conclude that any one of them, standing alone, was acting as
22  │  a de facto employer.
23  │          I think this is much different from the cases that
24  │  were cited in the papers, where the -- excuse me, the
25  │  defendants were, at one time, formal employers of the
```

1    plaintiffs.  And I think it's different from the *Mruz* case,

2    there was one person who seemed to control the board and

3    everything, and I don't think there is an allegation here.

4    These allegations of de facto employer, I do find to be

5    conclusory and insufficient, so that will be my ruling on

6    Count 1.

7              So what is next up?  Count 2.  Okay.

8    Ms. O'Donnell, can you come up on this one?

9              This is the Michigan Medicaid False Claims Act.

10   And if you don't mind, what I'd like to do is start again

11   with my questions, and then turn it over to you.  Does that

12   work for you on this one?

13             MS. O'DONNELL:  Yes.

14             THE COURT:  Okay.  So I understand this claim to

15   be, essentially, a retaliation claim under the act.  Is that

16   how you read it?

17             MS. O'DONNELL:  Yes.

18             THE COURT:  Okay.

19             MS. O'DONNELL:  But I think -- oh, I apologize.

20             THE COURT:  My question was going to be this:  Is

21   this statute, MCL 400.610c, any materially different

22   from 3730(h)?

23             MS. O'DONNELL:  Yes, it is.  It is much more

24   specific as to what the individual was doing, was required to

25   be alleged -- the activity that he was alleged -- the

1    protected activity definition is different.  I mean, the

2    statute, itself, states that -- that there must be

3    allegations of the filing, assistance in, or participation in

4    furtherance of a qui tam action.  Those allegations are not

5    here.

6                THE COURT:  Hold on.  Can we just go slow for one

7    sec?

8                MS. O'DONNELL:  Oh, yeah.  I apologize.

9                THE COURT:  What would be helpful to me is if we

10   could compare the language of the two statutes.

11               MS. O'DONNELL:  Yes.

12               THE COURT:  So the -- I'm looking at 3730(h), and

13   I'm looking at -- it's quoted in the *McKenzie* case --

14               MS. O'DONNELL:  Yes.

15               THE COURT:  -- which is the year 2000 case.

16               MS. O'DONNELL:  Yes.

17               THE COURT:  Has there been any amendment to this

18   since then, that would be relevant here or can I look at

19   that?

20               MS. O'DONNELL:  You can look at that.

21               THE COURT:  Okay.

22               MS. O'DONNELL:  Yeah, 3730, yes.

23               THE COURT:  So -- so this talks about an employee

24   who's discharged, demoted, suspended, threatened, harassed

25   because of his lawful acts on behalf of the -- and then the

```
 1    key language that I want to focus on is "in furtherance of an

 2    action under this section."

 3              MS. O'DONNELL:  Yes.

 4              THE COURT:  Isn't that identical language

 5    in 400.610c?

 6              MS. O'DONNELL:  No, it is not, because 400.610c

 7    provides that -- c(1) provides that -- and the applicable

 8    case law provides that in order to state a prima facie case,

 9    the MMFCA requires allegations of the filing, assistance in,

10    or participation in furtherance of a qui tam action or

11    cooperation or assistance with a government investigation.

12              THE COURT:  Hold on one sec.

13              MS. O'DONNELL:  Let's see.  Here we are.

14    Employee -- an employer shall not, 10c, shall not --

15              THE COURT:  Can I -- I just want to go --

16              MS. O'DONNELL:  Yes.

17              THE COURT:  You made a reference to controlling

18    case law.  I didn't find a single case construing this

19    statute, so did I miss something there?

20              MS. O'DONNELL:  Let's see.  Well, we think the

21    cases we cited, *Suchodolski v. Michigan Consolidated* --

22              THE COURT:  That's on the public policy

23    disparate --

24              MS. O'DONNELL:  Oh, yeah, that is, yes.

25              THE COURT:  I'm looking at your brief, pages --
```

```
 1              MS. O'DONNELL:  The Mikhaeil --

 2              THE COURT:  -- 16 to 18.

 3              MS. O'DONNELL:  Yes, the Mikhaeil case.

 4              THE COURT:  I didn't see any cases, but I don't

 5    mean to be critical there, I just didn't see -- I don't think

 6    there are any cases, so I don't mean to criticize you for not

 7    citing it.

 8              MS. O'DONNELL:  Oh, no, no.  So we cited -- I

 9    apologize -- the Mikhaeil case, which says that internal

10    reports are not protected activity, as the MMFCA admits the

11    other efforts language that's in the FCA retaliation statute.

12              THE COURT:  I'm looking at your brief -- can we

13    just look at it together?  I just want to make sure I catch

14    up to you.

15              MS. O'DONNELL:  Yes.  The motion or the reply?

16              THE COURT:  The opening brief.

17              MS. O'DONNELL:  Okay.

18              THE COURT:  Can you let me know when you have that

19    one?

20              MS. O'DONNELL:  Yes, we -- let's see.  Yes, I'm

21    here.

22              THE COURT:  Okay.  So when I am looking at your

23    argument under the Michigan Medicaid False Claims Act, it

24    starts at page 16 with the argument headings --

25              MS. O'DONNELL:  Yes.
```

```
 1              THE COURT:  -- and carries over to the top
 2    one-quarter of page 18, right?
 3              MS. O'DONNELL:  Yes.
 4              THE COURT:  Am I missing it?  I don't see any cases
 5    cited there.
 6              MS. O'DONNELL:  Let's see if we cited it in
 7    the -- there isn't a case cited in that one.  Let's see.  In
 8    our reply, I believe we did, though.
 9              THE COURT:  Oh, there is a case.
10              MS. O'DONNELL:  Yes.  The Mikhaeil case, in our
11    reply.  Internal reports not protected activity --
12              THE COURT:  Do you have that case with you, by any
13    chance?
14              MS. O'DONNELL:  Yes, I do.  Yes.  It says on
15    page --
16              THE COURT:  Can you just hand it up, so I can take
17    a look?  I'm sorry.
18              MS. O'DONNELL:  I'm sorry.
19              THE COURT:  Can you bring it up to my law clerk?
20              MS. O'DONNELL:  Oh, yes.  I apologize.
21              THE COURT:  Thank you.  So I'm looking at this
22    case, and I want to confess, this is not one that I read
23    before taking the bench; I read a lot, but not this one.  And
24    this is a case in which Judge Edmunds said what you say, that
25    the Michigan statute doesn't include other efforts language
```

1    that was added into the 3730 in some 2009 amendments.

2         MS. O'DONNELL:  Yes.

3         THE COURT:  But Judge Edmunds says that even before

4    those amendments, the Sixth Circuit recognized that internal

5    reports can qualify as protected activity, and she says the

6    other efforts language made clear that that was a correct

7    interpretation.

8         So in *McKenzie,* the Sixth Circuit is talking about

9    internal reports and recognizing that under a version of the

10   statute that essentially mirrored the Michigan statute,

11   internal reports were enough.  So why doesn't *McKenzie*

12   suggest that under the Michigan statute, internal reports can

13   be enough?

14        MS. O'DONNELL:  Well, I think that *Mikhaeil* is

15   clear and rules differently, in terms of that internal

16   reports are not enough, because the statute doesn't have the

17   other efforts language.  Also, the statute also --

18        THE COURT:  Look -- look, let me try this again.

19        MS. O'DONNELL:  Okay.

20        THE COURT:  I understand what Judge Edmunds said --

21        MS. O'DONNELL:  Yes.

22        THE COURT:  -- and no one in the world thinks

23   higher of her than I do.

24        MS. O'DONNELL:  Okay.

25        THE COURT:  Set aside her decision for a second.

1          MS. O'DONNELL:  Okay.

2          THE COURT:  I don't mean set it aside.

3          MS. O'DONNELL:  Okay.

4          THE COURT:  I mean, her decision first

5    acknowledges --

6          MS. O'DONNELL:  No, I understand what you're

7    saying.

8          THE COURT:  -- that even before that language was

9    in the federal statute, my bosses in Cincinnati said the

10   federal statute, while it was worded exactly like the

11   Michigan statute, covered internal reports.

12         So if we were making this argument in 2002, it

13   would be pretty clear, right?  I would hold up the two

14   statutes, they'd be identical, and we'd say, if internal

15   reports are protected federally, then they've got to be

16   protected under the state law, right?  So --

17         MS. O'DONNELL:  But I think the statute is

18   different now, and I think the Michigan Medicaid False Claims

19   Act specifically says that the retaliation is because the

20   employee initiated, assisted in, or participated in the

21   furtherance of an action under this act, or they cooperated

22   with an investigation.

23         THE COURT:  Let me stop you for a sec.

24         MS. O'DONNELL:  Yes.

25         THE COURT:  Set aside Judge Edmunds' decision.

1          MS. O'DONNELL:  Yes.

2          THE COURT:  In the *McKenzie* case, the Sixth Circuit

3   was dealing with a version of 3730(h) that mirrored the

4   Michigan statute.

5          MS. O'DONNELL:  Uh-huh -- the way the Michigan

6   statute is worded now?

7          THE COURT:  It mirrored it in relevant respect.

8          MS. O'DONNELL:  Okay.

9          THE COURT:  It did not contain the other efforts

10   language.

11          MS. O'DONNELL:  Okay.

12          THE COURT:  I asked for your case.  Do you want to

13   look at mine, that has the version of the statute?

14          MS. O'DONNELL:  Sure, and I do have the case as

15   well.

16          THE COURT:  Do you have *McKenzie*?

17          MS. O'DONNELL:  I do.

18          THE COURT:  I will hand back yours.

19          MS. O'DONNELL:  Yes, I have *McKenzie*.  I mean, it's

20   my position that -- and which portion of --

21          THE COURT:  Do you have the Westlaw printout?

22   You're a Lexis person, aren't you?

23          MS. O'DONNELL:  Yeah -- yes, I'm a Lexis person.

24          THE COURT:  I'm totally anti-Lexis.  I think of

25   Lexis like I think of Michigan State and Ohio State.

| | |
|---|---|
| 1 | MS. O'DONNELL:  Okay.  All right.  Which |
| 2 | page number?  Or do you want me to just speak generally? |
| 3 | THE COURT:  Just where the Sixth Circuit |
| 4 | quotes 3730(h). |
| 5 | MS. O'DONNELL:  Okay. |
| 6 | THE COURT:  It's is in headnote four of the Westlaw |
| 7 | printout.  Looks like it's on page 513 and 514 of the |
| 8 | decision. |
| 9 | MS. O'DONNELL:  Okay.  There are no headnotes in |
| 10 | this version.  Perhaps I should look at yours. |
| 11 | THE COURT:  Okay. |
| 12 | MS. O'DONNELL:  Okay.  Thank you.  I apologize. |
| 13 | THE COURT:  It's only fair; I borrowed yours. |
| 14 | MS. O'DONNELL:  Okay. |
| 15 | THE COURT:  So once you've had a chance to look at |
| 16 | that, I'm talking about the indented quote from 3730(h). |
| 17 | MS. O'DONNELL:  Right. |
| 18 | THE COURT:  Okay.  So when I was looking at this |
| 19 | issue this morning -- |
| 20 | MS. O'DONNELL:  Uh-huh. |
| 21 | THE COURT:  -- I was not remembering these 2009 |
| 22 | amendments.  In my -- |
| 23 | MS. O'DONNELL:  Right. |
| 24 | THE COURT:  In my own mind, I was thinking the |
| 25 | statute still looked like it did -- |

1      MS. O'DONNELL:  No, yes.

2      THE COURT:  -- when the *McKenzie* court ruled.

3      MS. O'DONNELL:  Right.

4      THE COURT:  But the *McKenzie* court was looking at

5  the statute before it included this new language.

6      MS. O'DONNELL:  Uh-huh.

7      THE COURT:  And it seems to me, the court said a

8  statute that looks almost exactly like the Michigan statute

9  does today --

10      MS. O'DONNELL:  Uh-huh.

11      THE COURT:  -- even without this other acts

12  language, still covers internal reporting.

13      MS. O'DONNELL:  Right.

14      THE COURT:  And so isn't the right way to look at

15  this, that maybe federal courts were split about that, the

16  Sixth Circuit had it right, Congress wanted to make it even

17  clearer, but the Sixth Circuit seems to me to be telling me

18  that a statute that's worded very much like Michigan, covers

19  internal reports, even without the other acts language.

20      MS. O'DONNELL:  I mean, I think here, *McKenzie* is

21  distinguishable.  It says, although internal reporting may

22  constitute protected activity, the internal reports must

23  allege fraud on the government.  We haven't seen any internal

24  reports alleged here, certainly not alleging fraud on the

25  government.

```
 1            THE COURT:  Let me --
 2            MS. O'DONNELL:  There's no detailed fraud --
 3            THE COURT:  Let me ask my question a little more
 4   simply.
 5            MS. O'DONNELL:  Okay.
 6            THE COURT:  Although you very respectfully
 7   disagreed with me a minute ago --
 8            MS. O'DONNELL:  Yes.
 9            THE COURT:  -- I concluded that there are plausible
10   allegations here, of fraud against the government.
11            MS. O'DONNELL:  Okay.
12            THE COURT:  Doesn't that conclusion, which I
13   understand you disagree with, carry over to Count 2?
14            MS. O'DONNELL:  Well, I think the FCA has become
15   much broader now, in terms of what constitutes, as you point
16   out, protected activity.  I mean, and here, before, though,
17   it seems like the courts were more specific as to what that
18   protected activity had to look like, very much like the
19   Michigan statutes does now, that there has to be an internal
20   report alleging fraud on the government, as specified by the
21   court here.  And that's what the Michigan statute says, too,
22   that it has to be in furtherance of an action under this act.
23   And I think that's what *McKenzie* said as well.
24            And while there may be -- you have ruled that there
25   are allegations here that he made complaints, there are no
```

```
 1    allegations that there was a specific investigation in
 2    furtherance of any Medicare Fraud Act.  He may have made
 3    complaints to the -- to the defendants, which we allege
 4    weren't causally connected, but I know you've ruled on that,
 5    there's no allegation here that there was a formal
 6    investigation at all, like there is here in McKenzie.
 7              THE COURT:  What do you mean, a formal
 8    investigation in McKenzie?
 9              MS. O'DONNELL:  I mean, he claims that he conducted
10    an investigation generally, but those allegations are
11    conclusory.  There's no allegation that he actually put forth
12    a report -- an internal report alleging a fraud on the
13    government, like there is in McKenzie.  And now this is how
14    the Michigan statute is interpreted under Mikhaeil.  I mean,
15    those allegations are quite conclusory as to what he
16    complained about and how he complained.  There isn't any
17    allegation that he actually, internally, reported this.  It's
18    much broader now, and I think that's consistent with how the
19    statutes are read.
20              I think the FCA retaliation statute, before its
21    amendment, was much narrower in scope, and I think their
22    intent was to make it somewhat broader as to what the
23    protected activity could be, but that sort of broadening of
24    what the protected activity could be, that just hasn't
25    happened under the state law, it's much more specific as to
```

1    what has to be alleged in order to bring a retaliation claim.

2           THE COURT:  Okay.  I think I understand your point.

3    Can I trade you back your case for mine?

4           MS. O'DONNELL:  Yes.

5           THE COURT:  Is there anything else that you want to

6    say on the Count 2?

7           MS. O'DONNELL:  Yes.

8           THE COURT:  Oh, you didn't take your case.

9           MS. O'DONNELL:  I apologize.

10          THE COURT:  If you want to sign it, I'll keep it as

11   a token of your argument.

12          MS. O'DONNELL:  We also believe that the defendants

13   are improper parties.  The individual defendants are improper

14   parties to this claim, as well.  We don't think that there's

15   any sufficient allegation of de facto employer.  The statute,

16   itself, is clear, too, about -- it references an employer and

17   there isn't any explanation or allegation in the complaint to

18   suggest that the individual defendants are employers.

19          THE COURT:  Okay.  Thank you.

20          Unless you have something different to say than

21   what we just talked about with Count 1, I don't have any

22   questions.

23          MS. TAYLOR:  Okay.  I don't have anything

24   different.  I just wanted to make a couple points in response

25   to Counsel's arguments about the expansion -- the amendments

1  in 2009.

2          THE COURT:  You're winning on that one.

3          MS. TAYLOR:  Okay.

4          THE COURT:  Okay.

5          MS. TAYLOR:  I'm all set.

6          THE COURT:  All right.  With respect to Count 2,

7  I'm going to do exactly what I did with Count 1, I'm going to

8  grant it in part and I'm going to deny it in part.

9          I'm going to deny the motion to dismiss Count 2,

10  the claim under Michigan Medicaid False Claims Act to the

11  extent that the claim is brought against the corporate

12  defendant.  I, at least, think that claim is plausible.

13  There's an interesting argument here that the Michigan

14  statute is meaningfully different.  You can further develop

15  that at summary judgment, but for purposes of today, the way

16  I look at this is the Michigan statute, in all material

17  respects, is identical to the version that the Sixth Circuit

18  was construing in the *McKenzie* case, the version of 3730(h).

19  It's not verbatim, but to me it is materially the same.  Both

20  of those statutes refer to participating in something in

21  furtherance of an action under this act.  And for the same

22  reasons that I believed the plaintiff plausibly alleged a

23  claim under 3730(h) against the corporate defendant, I think

24  that the plaintiff has also plausibly satisfied the standard

25  that *McKenzie* set forth, which I think applies equally to

 1    MCL 400.610c.  I will revisit that at summary judgment, if

 2    you want to further develop that argument, but for today, I'm

 3    going to let that claim proceed against the corporate

 4    defendants.

 5            I'm going to dismiss that claim against the

 6    individual defendants for the same reason I dismissed Count 1

 7    against the individual defendants.

 8            Okay.  Count 3 is the public policy claim.  Here,

 9    what I would like to do is start with my questions for

10    Ms. Taylor, rather than for the defendants, so once you get

11    settled in on this one, let me know.

12            MS. TAYLOR:  All right.  I am ready.

13            THE COURT:  Okay.  This is a really interesting

14    argument that the defendants make.  So the defendants say you

15    are bringing a claim for termination in violation of public

16    policy, and they suggest that that claim is not available

17    here, because Dr. Gold was employed under an employment

18    contract with a fixed term, could only be terminated for

19    cause, and was not an at-will employee.  And the defendants

20    tell me that claim is not available to an employee who has a

21    just-cause employment contract for a fixed period of time.

22            And there's not a lot of Michigan law directly on

23    point, but the case that I found most informative was a

24    Supreme Court of Michigan case called *Clifford v. Cactus*

25    *Drilling Corp.*  This is one that is cited in one of the cases

1    that is cited before me, *Majeske v. Bay City*.  That was the

2    case where the Michigan Court of Appeals agreed with the

3    defendants here, and they based that conclusion, in part, on

4    this *Clifford* decision.

5            And let me just read briefly a section of it to set

6    up this discussion.  I will try to read slowly.  This is the

7    Michigan Supreme Court, and they say, "Generally a contract

8    for permanent employment, or for an indefinite term, may be

9    terminated for any reason or for no reason."

10           Then they go on to say, "This common law

11   characterization of the employment relationship as at-will

12   evolved from the judiciary's unwillingness to interfere with

13   parties' freedom to contract and a belief in the equality of

14   bargaining power between employer and employee.

15           Although many workers are now protected from

16   arbitrary discharge by collective bargaining agreements and

17   civil service regulations, which provide that employment may

18   be terminated only for 'just cause', the majority of the

19   American workforce operates under an employment-at-will

20   relationship.  Many legislatures and courts, however, have

21   tempered the harshness of the at-will relationship by

22   developing public policy exceptions to the doctrine.

23           Where legislatures and courts have identified

24   specific grounds for termination as being repugnant to a

25   clearly-expressed public policy, the employer's absolute

 1    freedom to terminate the employment is circumscribed pro

 2    tanto.

 3          In Michigan, several public policy exceptions have

 4    been grafted onto the at-will doctrine."  And so that's them

 5    talking in 1984.

 6          In the *Suchodolski* case, that really adopted this

 7    doctrine at the Supreme Court level, it was phrased in terms

 8    of at-will employees.

 9          Given the way the Supreme Court of Michigan

10    characterizes this doctrine as protecting at-will employees,

11    what's the strongest argument that it applies to an employee

12    under a just-cause or fixed-term employment contract?

13          MS. TAYLOR:  So, Your Honor, I think it is a very

14    common sense argument.  The public policy tort theory is

15    designed to -- because there is a benefit to society in

16    protecting individuals who speak up about violations of the

17    law or wrongdoing at work.  The public policy tort is an

18    exception to the at-will doctrine, just like prohibitions

19    against sexual harassment or race discrimination are

20    exceptions to the at-will employment doctrine.

21          All of the, you know, the ELCRAs, the Title VIIs,

22    these are all exceptions to the at-will employment doctrine.

23    Those cases that you just talked about do not say this

24    doctrine is inapplicable to just-cause employees.  This

25    is -- as you noted, this is not a very well developed issue

1   in Michigan law, but, you know, for the reasons I just

2   stated, it simply doesn't make sense to conclude that

3   just-cause employees should not be protected if they are

4   terminated because they refused to go along with illegalities

5   at work.

6          THE COURT:  You say that, which leads me to the

7   next question, which is -- I wrote this on one of these

8   sticky notes that I have up here -- aren't they already

9   protected?  In other words, if you have a just-cause

10  employment contract, how can it possibly be just cause to

11  fire somebody on a basis that would violate public policy?

12         MS. TAYLOR:  Okay.  So just cause can be defined

13  under a contract.  So, Your Honor, just going back to the

14  point that I think I just made, there's no law here that

15  holds that a public policy tort claim can't arise from a

16  just-cause employer, using cause under a contract as -- you

17  know, as defined under a contract, as pretext for firing

18  someone because they, for example, didn't want to go along

19  with Medicaid fraud.

20         THE COURT:  Well, that would -- it just so happens

21  that Dr. Gold's contract would have prevented that.

22         MS. TAYLOR:  Well, Your Honor, the defendants'

23  position is that they fired him for, you know -- they -- in

24  the termination letter, they list -- let me -- I can go back

25  to the language that they say, but they -- I think that the

1    cause language they rely on is unprofessional conduct, which

2    his contract would allow, but our position is that is a

3    pretext for the fact that he spoke up against, you know,

4    fraud and other --

5            THE COURT:  Right, but that -- that's not the

6    question.  If you were -- the question is -- set aside the

7    pretext, the question is, what does the contract actually let

8    them terminate for?

9            But give me an example where a just-cause employee

10   could be lawfully terminated for a reason that violates

11   public policy?  There's no question of pretext; the employer

12   says, yes, we're terminating you -- so, you know, one of the

13   old -- before there was an amendment to the workers'

14   compensation statute, this public policy discharge claim was

15   often brought by employees who were terminated for filing a

16   workers' comp claim.  Are you aware of that?

17           MS. TAYLOR:  Can you repeat that one more time?

18           THE COURT:  Yes.  This tort started off when the

19   Kroger Company fired an employee who brought a workers' comp

20   claim.

21           MS. TAYLOR:  Okay.

22           THE COURT:  All right.  And the Michigan Court of

23   Appeals was -- which was the first to recognize this, said

24   that violates public policy, you can't do that.

25           MS. TAYLOR:  Uh-huh.

1    THE COURT:  The Michigan workers' comp statute was

2  subsequently modified to specifically prevent that, so we

3  don't have that claim anymore, but pretend we were still in

4  the world where the statute hadn't been amended.  If somebody

5  had a contract that said they could only be fired for just

6  cause, and the employer said we are firing you because you

7  filed a workers' comp claim, wouldn't that be a losing

8  position by the employer?  Wouldn't the employee already be

9  protected?

10    MS. TAYLOR:  No.

11    MS. GORDON:  May I add something to this, Judge?

12  Do you mind?  Just because I've been in this area of law

13  for 40 years, and I remember the *Kroger Sventko* case, and I

14  remember all of the iterations -- the oddball iterations with

15  regard to the point you're making here, about why just cause

16  would be excluded from public policy tort and how shocking it

17  was when -- I can't remember what judge or justice wrote the

18  opinion, it was an at-will case.  The vast majority of people

19  in Michigan are at-will employees, that's why you see this

20  continual language that this is an exception to at-will.

21  That's all the courts ever say.

22    I have many -- or have had many clients who have a

23  very a specifically worded just-cause contract.  You're

24  thinking that just cause means you have to have a legitimate

25  business reason and, hence, that if you're reporting illegal

1    activity internally, that must not be just cause, but that's

2    not so.  There are many just-cause contracts that have very

3    specific categories.

4            Here is what the definition of just cause is:  A

5    failure to perform X duties after being given 30 days notice.

6    Under only that prong is there just cause.  It is a

7    just-cause contract, but it doesn't protect my employee -- my

8    client if he's actually being fired for reporting illegal

9    activity.  It doesn't get anywhere.

10           I would have to -- the defendant would argue there,

11   he's a just-cause employee, this case doesn't help me.  But

12   my answer is, well, I have a public policy tort theory here,

13   because the real reason you fired him was not because he

14   didn't do duties A, B and C, the real reason you fired him is

15   because he refused to violate the law, he wouldn't go along

16   with your fraud.

17           So the just-cause employee, like Dr. Gold, why does

18   he not have the same protection that an at-will employee has?

19   Whistleblower Protection Act covers at-will --

20           THE COURT:  Can you --

21           MS. GORDON:  -- for cause.

22           THE COURT:  As I mentioned at the beginning, I go

23   best in bite-size chunks.  So give me a specific example of a

24   contract where there is a just-cause provision and the

25   employee could be fired -- set aside pretext, the question

```
 1   for me is, where the employer says we're firing you for a
 2   reason that violates public policy, but it wouldn't be caught
 3   up in the just-cause provision.
 4            MS. GORDON:  Well, first of all, the employer never
 5   says that.  That never happens.
 6            THE COURT:  But, look, in the pretext case, you
 7   don't need the public policy discharge claim.  If you have a
 8   contract that says he can only -- the employee can only be
 9   fired for reasons A, B and C, and your position is they were
10   fired for something else, it doesn't matter what the
11   something else is, you can win on a breach of contract claim
12   if it wasn't A, B or C.
13            MS. GORDON:  No, not necessarily, because maybe
14   they are going to show it was A, B or C.  They're going to
15   continue to fight, but that's exactly our position here, it
16   was A, B and C, but that's a lie, that's a pretext.
17            THE COURT:  But you win -- if you prove that to a
18   jury, you win.  You don't --
19            MS. GORDON:  I win on the breach of contract, Your
20   Honor.
21            THE COURT:  Right, so the -- here's how I think
22   about this and this is what would help me, if you can
23   respond.  I understand this tort claim to be -- to have been
24   created to protect somebody who doesn't have protection.  In
25   the hypothetical that you and I were just discussing, your
```

```
 1    client has protection if you prove that what your client says
 2    happened happened.  Adding the tort claim doesn't give your
 3    client any more protection if the jury thinks you're wrong.
 4    If the jury believes you, you'd win under either theory, you
 5    don't need the extra theory for your just-cause person.
 6    That's what I'm struggling with.
 7              MS. GORDON:  Well, there is much more to it,
 8    because a contractual claim can be very short.  And if
 9    somebody's fired because they are being retaliated against
10    for refusing to go along with the illegal activity, their
11    contract may end in six months anyway, but had they not
12    engaged in protected activity, they would have remained on.
13              So contractual terms can be very limiting, and the
14    way you're thinking of this means that an employee does not
15    get all the relief that the at-will employee would get, which
16    is an indefinite term of employment and emotional distress
17    damages.
18              THE COURT:  That's available for a public policy
19    claim?
20              MS. GORDON:  Yes, it is, Judge, it surely is.  So
21    the -- the just-cause employee is left in a much more dire
22    situation.  And it's just like it would be just like a
23    Title VII claim does cover a just-cause employee, there's a
24    reason for that.  That's because even, you know, if it did
25    not, we would be in the same situation.  I could discriminate
```

1    against somebody based on his race and what could he get out

2    of that?  He could get the term of his contract if he's

3    just-cause.

4             THE COURT:  Let me ask you a little bit different

5    question.  Do you want to stay up here or do you want me to

6    talk to Ms. Taylor about this?

7             MS. GORDON:  I don't know what your question is.  I

8    just wanted to say I've lived with this.

9             MS. TAYLOR:  She's the expert.

10            MS. GORDON:  Well, I just think it's so -- the

11   cases in Michigan are so poorly written on this, and it's

12   just -- being an employment lawyer for all of these years, to

13   see people who have a just-cause contract being completely

14   foreclosed from bringing a legitimate claim that I'm entitled

15   to this for X period of time, it may go beyond my contractual

16   period because my contract would have been renewed but for

17   this.

18            THE COURT:  But here is my question for you:

19   Assume for the sake of this question that I agree with all of

20   your policy arguments, that it doesn't make sense, that, how

21   can this be?  What do you say to the point that I'm just a

22   district judge here and I have to do -- in this claim, I have

23   to predict what the Michigan Supreme Court would do.  And you

24   refer to the cases as sloppily written, and I understand why

25   you may say that.  But I struggled to find any Michigan

1    Supreme Court case that where I could, in good faith, predict

2    that this claim is available to a just-cause employee.

3           MS. GORDON:  Okay.  That's fine.  I think that the

4    Michigan Supreme -- the current Michigan Supreme Court will

5    definitely find that, but if you are thinking of making a

6    ruling that's favorable to this line of cases, we will

7    withdraw this count.

8           THE COURT:  Oh, you don't want me to rule on it?

9           MS. GORDON:  No, if -- it sounds like -- I

10   understand what you're saying.  I do not want a

11   Matthew Leitman opinion agreeing with this weird line of

12   cases.

13          THE COURT:  Not -- if I were to rule in

14   this -- what you're calling the weird line of cases --

15          MS. GORDON:  Yes.

16          THE COURT:  -- it would just be a Matthew Leitman

17   statement here and an order that says, for the reasons stated

18   on the record.

19          MS. GORDON:  Yes, because it would be supportive of

20   what I believe is bad law, that no court in Michigan has

21   thought through, and everybody's falling into the at-will

22   bucket.

23          THE COURT:  If I were to rule that -- look, I

24   haven't yet made up my mind.

25          MS. GORDON:  Okay.

```
 1          THE COURT:  But if I were to rule that, as I

 2   mentioned 30 seconds ago, I'm just a district judge.  Nobody

 3   is bound by a damn thing I say.  A lot of people think I'm

 4   totally full of it.

 5          MS. GORDON:  I'll be seeing that opinion.  I'll be

 6   happy to --

 7          THE COURT:  Who gives a crap what I say.  If you

 8   withdraw it, you can't go to the Sixth Circuit and maybe get

 9   judges who see it differently.

10          MS. GORDON:  I would rather be in the Michigan

11   Supreme Court, but I take your point.  I just -- I'm not sure

12   which way you're going on it and you haven't decided on it.

13          THE COURT:  Look, I'm not one to hide the ball.

14          MS. GORDON:  I see.

15          THE COURT:  My inclination is that if I ever were

16   to make a ruling, it might be, and I'm not saying this so

17   someone can wave this transcript around, it might be one that

18   wouldn't end up favoring you.  If that's the case, do you

19   want to withdraw the claim now?

20          MS. GORDON:  Let us wait until the end of the

21   argument today, and let me talk to my client, and I will let

22   you know before we leave.

23          THE COURT:  Okay.

24          MS. GORDON:  Thank you, Your Honor.

25          THE COURT:  All right.  Ms. Taylor, anything else
```

1    on this count?

2           MS. TAYLOR:  I mean, earlier you asked me for a

3    hypothetical, under which a just-cause employee -- you

4    remember the hypothetical.  And I think, in certain cases,

5    you know, there's an after required evidence doctrine that

6    would meet the hypothetical.  So they could fire somebody

7    because they filed, you know, a workers' comp claim, and then

8    under certain circumstances, that claim could

9    potentially -- you know, they could potentially lose the

10   breach of contract claim based on after required evidence,

11   and then my just-cause employee would not be protected by

12   their just-cause contract.

13          THE COURT:  Got it.  Okay.  Ms. O'Donnell, do you

14   want to come up for a second?

15          MS. O'DONNELL:  Sure.

16          THE COURT:  Is there anything that you want to add

17   on this public policy claim?

18          MS. O'DONNELL:  I mean, I agree with the assertions

19   with respect to how the law is -- holds with respect to the

20   fact that, you know, at-will employment is a necessary

21   precondition to this act.  And additionally looking at the

22   underlying statute that's at issue here, it has to do with

23   health facilities or agencies, so an alternative argument, we

24   believe that this is inappropriate as to the doctor

25   defendants, but it should be dismissed to all the defendants.

| | |
|---|---|
| 1 | THE COURT:  Okay.  Well, I will wait until the end |
| 2 | of the hearing to make a ruling on that. |
| 3 | MS. O'DONNELL:  Okay. |
| 4 | THE COURT:  Ms. Taylor, anything that you want to |
| 5 | say beyond the briefs, with respect to the breach of contract |
| 6 | claim against the individual defendants? |
| 7 | MS. TAYLOR:  Nothing further. |
| 8 | THE COURT:  All right.  With respect to Count 4, |
| 9 | the breach of contract claim, I don't need any additional |
| 10 | argument on that.  I'm going to deny the motion to the extent |
| 11 | it seeks dismissal against the corporate entity, and grant it |
| 12 | to the extent it seeks dismissal against the individual |
| 13 | defendants, and maybe that's all it sought.  So the breach |
| 14 | claim can go ahead against the company. |
| 15 | Ms. O'Donnell, is there anything that you want to |
| 16 | say on the Elliott-Larsen claim, Count 5? |
| 17 | MS. O'DONNELL:  With respect to the Elliott-Larsen |
| 18 | claim, just as a threshold matter in the alternative, we |
| 19 | believe it is brought inappropriately against the individual |
| 20 | defendants.  And additionally, we think that the allegations |
| 21 | with respect to supposed discrimination are vague and are not |
| 22 | close in time to show any sort of causal connection between |
| 23 | any sort of alleged discrimination and the termination. |
| 24 | It's also important to point out that the |
| 25 | discrimination that he's alleging has to do -- like, vaguely |

1   about some -- in July of 2021, an allegation that he alleges

2   that someone was passed over for a promotion, and then

3   another vague allegation as to geographic bias, as well.

4           And if we go back to the amended complaint to the

5   specific allegations, there isn't anything as to those

6   complaints with respect to -- linked up with respect to the

7   termination.

8           THE COURT:  Anything else on that?

9           MS. O'DONNELL:  No, Your Honor.

10          THE COURT:  All right.  Ms. Taylor, do you have

11  anything to say with respect to the Elliott-Larsen claim as

12  it is pled against the individual defendants, beyond what you

13  have already said?

14          MS. TAYLOR:  I would just say that ELCRA -- the

15  case law in ELCRA and naming individual defendants and how

16  individual defendants has come to be recognized as an

17  employer, that's a pretty well developed area of the law.

18          This argument, I believe, was as to ELCRA, I

19  believe that was raised for the first time in the reply by

20  defendants.  And there's a case here, that as a result of

21  that not cited in their papers --

22          THE COURT:  Hold on one sec.  Ms. O'Donnell, did

23  you argue in your opening brief that the Elliott-Larsen claim

24  fails against the individual defendants?

25          MS. O'DONNELL:  Yes, I believe we did.  That there

```
 1    was no report to any specific person with respect to the
 2    allegations, that they are conclusory or vague.
 3              THE COURT:  I'm asking -- maybe my question was
 4    unartful.  With respect to the federal claims, I have been
 5    drawing a distinction between whether the claim could be
 6    brought against the company or the individual defendants, and
 7    you had argued with respect to those claims, that they don't
 8    lie against individual defendants.
 9              MS. O'DONNELL:  Yes.
10              THE COURT:  Apart from whether there's any valid
11    claim stated under the Elliot-Larsen Act, did you argue that
12    in your opening brief, that even if there is a claim, it
13    can't be brought against the individual defendants because
14    they are not employers?
15              MS. O'DONNELL:  I think we lumped those arguments
16    all together.  I think those arguments were lumped together,
17    and with respect to this particular claim as to the lack of
18    specificity as to the claim against all the defendants.  We
19    said that it should be -- the lack of specificity means that
20    it should be dismissed to all the defendants, and that the --
21    there wasn't any sort of specification as to who the
22    complaints were made to or reported to.
23              THE COURT:  Again, I'm asking -- I mean to be
24    asking a different question.
25              MS. O'DONNELL:  Yes.
```

```
 1              THE COURT:  What you're arguing is there is no
 2    plausible ELCRA claim at all, because there weren't specific
 3    reports.  My question to you is:  Assuming there -- did you
 4    make argument, like you did on the other ones, that even if
 5    there is a viable ELCRA claim against the entity, there is
 6    not a viable ELCRA claim against the individuals, because
 7    ELCRA doesn't reach the individuals?  Did you make that
 8    argument in your opening brief?
 9              MS. O'DONNELL:  I think we made it implicitly, but
10    not as specifically as that.
11              THE COURT:  Where do you --
12              MS. O'DONNELL:  I think -- I mean, we say that it
13    should be dismissed as to all the defendants, but we didn't
14    cite specific law as to the parsing out the individuals
15    versus the company.
16              THE COURT:  Okay.
17              MS. O'DONNELL:  But we did that on the reply.
18              THE COURT:  Then, look, with respect to the ELCRA
19    claim, I'm going to deny the motion in its entirety and allow
20    this claim to go forward, at least for now, even as to the
21    individual defendants.
22              The only argument in the papers -- in the motion
23    papers, the affirmative brief, is that the claim is not
24    plausibly alleged.  I think it is plausibly alleged for many
25    of the reasons that I went through earlier.  I think there is
```

```
 1    a plausible allegation that he was complaining about racial
 2    discrimination and plausible allegations of causation with
 3    respect to that, and retaliation.  And so the argument made
 4    by the defendants here, was an all-or-nothing argument, so
 5    this claim will go forward, and I will deny the motion to
 6    dismiss the Elliott-Larsen claim in its entirety.
 7         The last claim is a claim under Section 1981.
 8    Ms. O'Donnell, do you have any different arguments that you
 9    would apply there as opposed to the ELCRA claim?
10         MS. O'DONNELL:  I think we -- should I -- I mean, I
11    think we set forth those arguments, as well as to the fact
12    that the actions that he took doesn't show that he engaged in
13    protected activity to begin with, and that there's no
14    temporal connection between his -- anything that he said with
15    respect to race or geographic bias or the promotion and the
16    termination.
17         We also cited a case, *Kean v. IT-Works*, which says
18    that a two-and-a-half month gap between the complaint and the
19    adverse employment action is insufficient to show causation,
20    and there is nothing to show that any sort of complaints
21    occurred close in time between the initial complaints in July
22    of 2021 and the termination, itself, in November of 2021.
23         THE COURT:  Okay.  I appreciate those arguments.
24    I'm going to deny the motion to dismiss Count 6 for the same
25    reason I denied the motion to dismiss the ELCRA claim.  I
```

```
 1    really appreciate and respect Ms. O'Donnell's arguments, but
 2    I think there's plausible allegations, here, that he was
 3    complaining about race discrimination and that that
 4    discrimination -- there's plausible allegations that those
 5    complaints led to his termination.
 6              So, Ms. Gordon, now's the time.  I have one claim
 7    left to decide.  What do you want to do on the public policy?
 8              MS. GORDON:  We are going to withdraw it, Your
 9    Honor, without -- we are going to withdraw it.
10              THE COURT:  Without prejudice?
11              MS. GORDON:  Not without prejudice.
12              THE COURT:  That's what I mean, you will-
13              MS. GORDON:  We are withdrawing -- yes, we will
14    dismiss the count.
15              THE COURT:  Without prejudice?
16              MS. O'DONNELL:  With prejudice?
17              MS. GORDON:  I think it would be with prejudice as
18    to this case, yes --
19              THE COURT:  Okay.
20              MS. GORDON:  -- as to this case, yes.
21              THE COURT:  So let me just review what this order
22    will say here.  So the motion to dismiss will be granted in
23    part and denied in part as follows:  With respect to Count 1,
24    I will deny the motion to the extent it seeks dismissal
25    against the corporation, and grant it to the extent that it
```

1    seeks dismissal against the individual defendants.

2           Same with Count 2, the Michigan Medicaid, I'm

3    denying that to the extent it seeks dismissal against the

4    corporation, I will grant it to the extent it seeks dismissal

5    against the individual defendants.

6           Count 3 is being voluntarily dismissed with

7    prejudice, without me opining one way or the other.

8           MS. GORDON:  Your Honor, if I may?  I think I

9    misspoke when I said with prejudice.  I think we are

10   dismissing it without prejudice.  I think we are entitled to

11   do that under the court rules.  I just want to make --

12          THE COURT:  All right.  You want a dismissal

13   without prejudice.  What's your position?

14          MS. O'DONNELL:  My position is this has been

15   briefed twice now, and if you're going to -- it's going to be

16   dismissed without prejudice, we feel there should be a ruling

17   to have some finality with respect to this cause of action.

18   We don't think it's fair to bring it for a third time,

19   after --

20          THE COURT:  All right.  How about this:  Would you,

21   Ms. O'Donnell, accept a dismissal without prejudice and a

22   covenant not to rebring this claim in this action?

23          MS. O'DONNELL:  I mean, I'm not sure what

24   the -- what the difference is.  I mean, I just think there

25   should be a ruling, because I don't think this cause of

1    action is proper.

2         THE COURT:  What about if her motion is to dismiss

3    that claim without prejudice, and I say I will grant it, and

4    my order will provide that, even though it's being dismissed

5    without prejudice, it can't be brought again in this action?

6         MS. O'DONNELL:  Well, I don't think it should be

7    brought again in any action, because it is improper under the

8    law and we have had to spend time and money --

9         THE COURT:  How about this:  How about it can't be

10    brought again against your clients?

11         MS. O'DONNELL:  Yes, I think that's --

12         MS. GORDON:  All right.  Your Honor, we will just

13    dismiss it.  The thought was if there should be a court

14    ruling that clarifies this area of law in Michigan, because

15    there's a lot of cases rolling around, if the law was

16    clarified, we might have an opportunity to rebring it, that's

17    what Ms. Marzotto Taylor and I were just discussing, but for

18    purposes of this case, we will dismiss it without prejudice

19    to clean this up.

20         THE COURT:  All right.  But Ms. O'Donnell is saying

21    if I'm going to let you dismiss it without prejudice, it

22    should be on the condition that it not -- this particular

23    cause of action not be brought by Dr. Gold against these

24    defendants, period.

25         MS. O'DONNELL:  Or any -- or any individual who is

1   an employee of Michigan Kidney or a past employee, and

2   directors and officers.

3           THE COURT:  Look, I'm not going to give a ruling

4   that's broader than if I would have ruled for you on the

5   merits.

6           MS. GORDON:  We will dismiss it with prejudice,

7   Your Honor.

8           THE COURT:  Okay.

9           MS. GORDON:  I apologize for that mixup there.

10          THE COURT:  Okay.  No problem.  Thank you.  And

11  just so we're clear, I thought you made a lot of interesting

12  points.  It is a very interesting issue.

13          MS. GORDON:  It is.

14          THE COURT:  So maybe you can get the folks in

15  Lansing to hear it.

16          So Count 3 will be dismissed with prejudice.

17          Count 4, I can't remember if there was a motion to

18  dismiss this in its entirety, but the breach of contract

19  claim may go ahead against the corporate entity, not against

20  the individual defendants.

21          The ELCRA claim I'm going to deny the motion to

22  dismiss that claim in its entirety, that can go ahead against

23  everybody.

24          So can the 1981 claim.  So we've got some of this

25  left.

```
 1              In terms of next steps, I assume we've not had a
 2    scheduling conference.  Why don't we get rid of that right
 3    now, so we can move ahead.
 4              The only question I ask is, how long do you want
 5    for fact discovery, Ms. Gordon?
 6              MS. GORDON:  Six months.
 7              THE COURT:  Ms. O'Donnell, how does that look for
 8    you?
 9              MS. O'DONNELL:  How does that sound?  Would you
10    want more time or --
11              UNIDENTIFIED PERSON:  Six months.
12              MS. O'DONNELL:  Okay.
13              THE COURT:  All right.  I will issue a case
14    management order.  All the dates in my case management order
15    are driven off the fact discovery deadline.  I'm very
16    flexible on scheduling, so if you guys get into it and you
17    decide that you need more time, let us know.
18              Also on discovery, my rule is simple, the most
19    reasonable person wins.  So please do not have discovery
20    disputes.  Please try to out-reasonable each other, in terms
21    of the breadth of the request, breadth of the objections.  If
22    you talk to the lawyers I just spoke to on Friday, on a Zoom
23    conference, when I completely lost my temper and behaved
24    inappropriately, it was a discovery dispute which brings out
25    the worst in me, so please try to avoid those.
```

 1              Is there anything else we need to chat about while
 2     we're together today, for the plaintiff?
 3              MS. GORDON:  Not from the plaintiff's side, Your
 4     Honor.
 5              THE COURT:  Ms. O'Donnell, anything from you?
 6              MS. O'DONNELL:  Let me just -- may I have one
 7     second?
 8              THE COURT:  Before you go back there, let me raise
 9     one other issue.  I'm always a big fan of efforts to settle
10     the case.  And I don't want anybody to feel like they have to
11     say anything today, but I will still enter this case
12     management order, but I'd ask each of you to talk to your
13     clients, who I see are here today, to see if you want me to
14     refer this for an early settlement conference with the
15     magistrate judge or if you want to do an early facilitation.
16     Don't tell me now.
17              Ms. Gordon, I nominate you, as the plaintiff, to be
18     the scrivener.  A week from today, will you send an e-mail to
19     Holly Ryan, my case manager, simply saying there is a joint
20     agreement to pursue either a magistrate judge settlement
21     conference or a private facilitation, or there's not a joint
22     agreement.  Don't tell me, if there's not, which side didn't
23     agree to it.
24              MS. GORDON:  Yes, we will do.
25              THE COURT:  Since we have the clients here, let me

1  put in a pitch for why this makes sense.  This litigation is

2  going to be very ugly for all of you.  Are you guys

3  physicians, there in the first row?  And Dr. Gold, you are?

4        THE PLAINTIFF:  Yes, sir.

5        THE COURT:  I can see where this litigation is

6  heading, and this is going to be a bunch of very

7  distinguished doctors crapping on each other in materials

8  that will be filed in the court and will be public and

9  everybody loses.

10       Dr. Gold, in round one, when you're the one that

11  gets to fire the bullets, it looks like you are wearing the

12  white hat and these guys are horrible, but these are just

13  allegations I have to accept as true today.  You can bet your

14  ass that's not what this case is going to look like on

15  summary judgment, when then testify under oath and share

16  their view and when all of you are out there trying to

17  succeed professionally.

18       The other thing is, this takes a ton of time and a

19  ton of emotional energy, and you guys are supposed to be

20  healing people and treating people.  So there is a huge cost,

21  emotionally, to these cases.

22       I understand you have strong feelings, but please

23  talk to your lawyers.  You both have great lawyers.  I'm

24  happy that the clients are here.  Dr. Gold, you have

25  outstanding lawyers.  And you folks from the defense side,

1    you guys have great lawyers as well.  This was a very, very

2    well briefed and argued motion, so you can assume, at every

3    step of the way, you will be very well represented.  And

4    don't assume that if your lawyer tells you, yeah, it makes

5    sense to talk about settlement, that they are showing

6    weakness.  They are showing sensibility, if they talk to you

7    about that.

8         So I look forward to working with you guys if the

9    case goes forward, but please take a few days and think very

10   hard about whether it makes sense to catch your breath and

11   talk about some sort of amicable resolution.  We'll enter a

12   short order saying what I did today, for the reasons stated

13   on the record.

14        Ms. O'Donnell, I think I had asked you if there's

15   anything else that you wanted to chat about?

16        MS. O'DONNELL:  Nothing further, Your Honor.  Thank

17   you.

18        THE COURT:  Thank you for coming in from Chicago, I

19   appreciate you making the trip.

20        Thank you for travelling in from Bloomfield Hills.

21   That's all we have.  We are adjourned.

22        MS. GORDON:  Thank you, Your Honor, and your staff.

23        THE LAW CLERK:  All rise.  Court is in recess.

24        (Proceedings concluded at 11:07 a.m.)

25                          —   —   —

1                     *C E R T I F I C A T I O N*

2            I, Robert L. Smith, Official Court Reporter of the

3 United States District Court, Eastern District of Michigan,

4 appointed pursuant to the provisions of Title 28, United

5 States Code, Section 753, do hereby certify that the

6 foregoing pages comprise a full, true and correct transcript

7 taken in the matter of JEFFREY M. GOLD, M.D. vs. MICHIGAN

8 KIDNEY CONSULTANTS, P.C., et al., Case No. 22-10699, on

9 Friday, February 3, 2023.

10

11

12                      *s/Robert L. Smith*

                       Robert L. Smith, RPR, CSR 5098

13                        Federal Official Court Reporter

                       United States District Court

14                        Eastern District of Michigan

15

    Date:  02/16/2023

16     Detroit, Michigan

17

18

19

20

21

22

23

24

25